WILLIAM BRIDGEWATER

*v.*

THE OCEAN CITY RAILROAD COMPANY and ATLANTIC CITY RAILROAD COMPANY.

[Filed July 18th, 1901.]

1. Where a general scheme of land improvement is announced to invited purchasers of lots, and part of the promulgated scheme is the declaration that a named portion of the lands within the general plan shall be devoted to special purposes, which are held out to be advantageous to all the lots to be sold, an implied covenant is thereby entered into by the owner with the lot purchasers that the named portion shall be devoted to the announced uses.

2. Each purchaser of a lot and his grantees may enforce this covenant against the grantor or his grantees who purchased with notice of this implied covenant.

3. He may also enforce it against the donee of the covenantor, who accepts as a gift a conveyance of part of the lands charged by the covenant. Such a grantee simply stands in the place of the donor. All the notice which the donor had at the date of the gift is imputed to his grantee who pays nothing for his deed.

Bridgewater *v.* Ocean City Railroad Co.

On bill, answer and proofs.

The complainant is the owner of two lots of land in Ocean City, Nos. 474 and 475, on the northwesterly side of Asbury avenue, between Ninth and Tenth streets, by purchase through an intermediate grantee from the Ocean City Association. There is a dwelling-house on the lots, in which the complainant resides, with his family. He filed his bill of complaint against the Ocean City Railroad Company and the Atlantic City Railroad Company, who are subsequent grantees of the Ocean City Association of a strip of land lying at the southeast side of Haven avenue, between Fifth and Sixth streets, alleging that the strip so conveyed to the defendants is a part of a certain tract of land which, by an implied covenant of the Ocean City Association with the complainant and other purchasers of its lots, has been devoted to be used as a camp ground and park, and that the defendant companies are erecting a passenger station thereon, in violation of that covenant, to the injury of the complainant and other purchasers of lots under the said covenant, destroying the attractiveness of the camp-meeting ground and making it less desirable as a place of recreation and place of religious instruction, interfering with the circulation of air, and with the view over the park and camp ground.

The complainant also refers to the decree of the court of appeals, in the case of *Lennig* v. *Ocean City Association, 14 Stew. Eq. 606,* declaring the validity of the covenant now in question, in favor of Lennig as a lotholder, and restraining the association from leasing the camp ground for a term of years with the privilege of erecting cottages thereon.

The complainant prays that it may be decreed that the tract of land between Fifth and Sixth streets has been dedicated as a park and camp-meeting ground, to be kept open and free from all buildings and other obstructions except the auditorium, and that the complainant is entitled to have them kept open and free from such buildings, and that the defendants may be restrained from further prosecuting the work of building the passenger depot and other buildings, and may be decreed to remove the obstructions thereon erected by them. Annexed to the com-

plainant's bill are copies of the association's maps, as filed in Cape May county clerk's office.

The defendant railroad companies file their joint answer, denying knowledge or notice of any devotion of the land between Fifth and Sixth streets to camp ground and park purposes, by either publication, filing of maps, public declaration or by recitals in conveyances. They admit that they have been advised of the Lennig decree since this suit was begun, raising a covenant in favor of the complainant, Lennig, "who was the owner of a lot or tract of land *immediately abutting* the said tract between Fifth and Sixth streets," but they deny that the opinion in that case affects their rights or is *res adjudicata* as to them. They deny that the Ocean City Railroad Company took title under the deed of May 20th, 1899, set out in the bill of complaint, conveying a twenty-foot strip at Haven avenue and Fifth and Sixth streets, and say that the railroad company received its title on December 29th, 1896, by deed from the association, conveying a strip one hundred and fifteen feet wide, at the same location, to be used for railroad purposes only, and not for freight purposes; and they deny that their conveyance was subject to the uses of the camp-ground tract set out in the bill. They allege that they had nearly completed their station when the bill in this cause was filed, restraining their occupation of their lot because it is part of the camp ground, and that the complainant had notice of that fact, and made no suggestion that he objected. They deny that the erection of their passenger station is a violation of the covenant of the association set out in the bill, and aver that it is a benefit to the community that the defendants should use such a passenger station to receive and discharge passengers to and from Ocean City. They allege that the rights under the covenant, if any there be, are subject to the rights of the defendant railroad companies, under the General Railroad act of April 2d, 1873, and its supplements, under which the defendant companies were incorporated, to take and condemn lands, &c. They allege that map section A was first filed, and they insist that this map, if any binding plan was adopted, was exclusive of any other, and that section A extends only to West avenue, and does not include Haven avenue, where their station.

is located.   They insist that if anyone can set up a covenant, it is only those purchasers whose lots abut on the camp ground; and they charge bad faith on the complainant, and that he is a mere instrument of the West Jersey and Seashore, a competing railroad company, to prevent the defendants from giving the public a more efficient service.

An injunction was allowed on the filing of the bill.   After the answer was filed, a motion was made to dissolve it, which was refused, and the cause has come to final hearing on the bill, answer and proofs.

The testimony, oral and documentary, exhibits the following circumstances: The lots of the complainant and defendants and the camp ground and park, above mentioned, together with a larger tract of other land, now constituting Ocean City, in Cape May county, New Jersey, were owned in one tract by the Ocean City Association, a corporation of this state, organized October 20th, 1879, by the Rev. W. B. Wood and others, the declared object of which was "the establishment of a summer seaside resort founded on Christian principles, and affording religious privileges as well as healthful recreations."   Its certificate was filed in the secretary of state's office on February 25th, 1880, and it began its conduct of business very shortly thereafter.   The Ocean City Association, in pursuance of this declared object, offered its lots for sale, and published maps on which were exhibited plans of the lots and streets, dividing the property into parcels for private purchase.

On May 25th, 1880, the association made its first public sale of lots.   It had previously advertised this sale by a publication called "The Ocean City Journal," a copy of which is produced in evidence.   It sets forth the names of the officers of the association.   The whole first page is devoted to the advertisement of the proposed sale and a description of the property, its advantages and attractions.   It refers to the camp ground in the following language:

"The space allotted to the encampment is 500 feet wide, from the thoroughfare to the ocean, with plenty of tenting ground.   It is contemplated to have all the appointments desirable to render the camp meeting

a real feast to the thousands who may congregate there for Christian worship.

"Those coming to tent with them will have every possible facility that will contribute to their comfort. Besides the regular services of the encampment, there will be temperance conventions, anniversaries and other Christian and philanthropic convocations, fully occupying the season and making it memorable in interest and profit.

"No pains will be spared to give to Ocean City a series of religious privileges equal to other resorts of kindred character."

Maps and plottings were exhibited to purchasers at the sale, showing the camp ground open from the bay to the ocean.

At the sale attention was called to these advantages of the open space for camp ground, &c., as an inducement to buyers, and lots were purchased upon these assurances then given. On June 9th, 1880, the association recorded the map called "Section A Ocean City" in Cape May clerk's office. The map is dated May 22d, 1880, and shows an open space between Fifth and Sixth streets, marked "camp ground," in the centre block, with the other sides of Fifth and Sixth streets plotted for sale as town lots. In 1881 the association issued a pamphlet, called the "Ocean City Annual," which contained the first annual report of its president. It thus refers to the camp ground, under the heading "Work Done:" "The camp-ground blocks, extending from the meadow to the ocean and from Fifth to Sixth streets, have been cleared of underbrush, drained and some of the hills leveled."

It also refers to the map of section A, comprising nine hundred and ninety-five lots, "besides the camp ground, tenting ground and parks;" to the laying out of streets and the construction of boardwalks; to the building of a wharf on the bay front. This annual repeated the publication of the above-quoted exploitation of the camp ground, beginning, "The space allotted to the encampment is 500 feet wide from the thoroughfare to the ocean." This publication was scattered broadcast in the most public manner, as an invitation to the purchase of lots.

In the succeeding year (1882) the association again published its "Ocean City Annual," referring to its previous publication above quoted, and stating the additional attractions and advantages which had been provided by the association since the former

Bridgewater *v*. Ocean City Railroad Co.

publication. ·It contained a special paragraph as to the camp-ground park, under these words:

"The Camp ground Park, extending from Fifth to Sixth street, and from Asbury to Wesley avenues, has been fully graded. It has also been laid out into plots formed by a system of converging walks, suitable to the formation of the park and the location of the auditorium. The walks are fifteen feet wide and have all been nicely graveled. Over 400 trees have been planted in and around the camp tract, and they are all doing well. It has been decided to beautify and ornament the park and make it the center of attraction. When our plans for ornamentation have been complied with, it will be 'a thing of beauty,' and, we trust, 'a joy forever.' That part of our camp ground lying between Wesley avenue and the ocean has been graded, and preparations made for opening a gravel walk from the auditorium to the ocean front, where the surf meetings are held. The part lying between Asbury avenue and the bay has also been cleared and graded."

Then follows a printed plan of a portion of the camp-ground park referred to; on this plan are printed the words "park," "auditorium" and "grove," with the converging walks above mentioned.

On April 17th, 1883, the association filed another map in Cape May county clerk's office, showing section A, B and C of the tract. On this map the space between Fifth and Sixth streets is indicated to be open from the thoroughfare to the ocean, making seven blocks. The laid-out streets cross this open space. All the blocks on Fifth and Sixth streets are plotted in town lots, except the seven blocks of camp ground, park, &c., which are not so plotted. Two of the blocks within this open space are marked "park," one of them is marked "grove" and the block between Wesley and Asbury avenues and Fifth and Sixth streets has the words "auditorium" and "camp ground." The other three blocks, between West avenue and Bay avenue, are indicated as open spaces, but with no words upon them.

The following diagram of the map of section A, B and C, filed by the association in the county clerk's office on April 19th, 1883, is a reduced copy of the open space indicated on that map:

Bridgewater *v.* Ocean City Railroad Co.

The lots owned by Lennig when he filed his bill in *Lennig v. Ocean City Association,* *14 Stew. Eq. 606,* are indicated by the Nos. 698, 700, 702.

The lots sold to the defendant railroad company are at Haven avenue, Fifth and Sixth streets, and are indicated by the mark -○- at each corner.

The lots described in the bill of complaint, now held by the complainant, were originally conveyed by the association to one Charles S. Pryor, by a deed in an especial form of the association grantor, referring to the lots conveyed as those lots, &c., "numbered 474 and 475, in section C on the plan of lots of the said Ocean City Association." This deed is dated July 7th, 1891. The complainant received title to his lot by conveyance from Pryor in 1896, subject to the reservations and restrictions of the association's deed to Pryor. The complainant is also the owner of about two hundred lots in Ocean City. The Ocean City Association, on December 29th, 1896, conveyed to the defendant the Ocean City Railroad Company twelve lots, Nos. 433 to 444, inclusive, in section B "on the plan of lots of the Ocean City Association." The same deed conveyed lots Nos. 265 and 266 on section C "on the plan of lots of the said association." The lots Nos. 433 to 444 are all within the open camp-ground space.

On the 20th day of May, 1899, the Ocean City Association, for a nominal consideration, conveyed to the defendant the Ocean City Railroad Company a strip twenty feet wide on the southeasterly side of Haven avenue, running from Fifth street to Sixth street, "on the plan of lots of the said Ocean City Association," subject to the condition that the said premises shall be used for passenger depot purposes only, and is not to be used for other purposes;" and also another strip on Haven avenue, on the opposite side of the way, twenty feet wide and three hundred and thirty feet long, subject to the condition that the above-described properties "shall be used for railroad purposes only," and to the further condition that the properties above described shall never be owned by any other railroad operated thereon, or by any person or company owning or operating the railroad on West avenue, and that the properties herein described must be owned, and the railroad thereon must be owned, and the railroad thereon must be operated by a competing person or company. Other conditions and restrictions are contained in the deed, which are of similar character to those expressed in the association's form of deed, including one obligating the grantee to observe the regulations of the association which it might thereafter make, which it might be "necessary to insure the original

intention and purpose of the party of the first part in securing the whole island as a Christian resort."

All of the deeds made to the railroad company are proven by the testimony of defendants' witnesses to have been made as gifts and without consideration paid.

Shortly after receiving this deed, the defendant railroad company began to construct a passenger station on the strip of land lying at the southeast side of Haven avenue, between Fifth and Sixth streets, being the park and camp ground above named.

The station is a one-story building, fifty-four feet long and twenty-one feet wide, with an open shed attached of about forty feet length, and is twenty feet high to the peak of the roof. It is located on Haven avenue, about midway between Fifth and Sixth streets. The platform along the station-house on Haven street, for a width of some six feet and a length of some ninety feet, is located within the lines of that street.

*Mr. John C. Sims, Jr.,* and *Mr. Mark R. Sooy,* for the complainant.

*Mr. David J. Pancoast, Mr. Clarence L. Cole,* and *Messrs. Charles Heebner & Robert Alexander* (of the Philadelphia bar), for the defendants.

GREY, V. C.

The defendant railroad companies contend, in the first place, that neither by action nor speech of a binding character did the Ocean City Association devote the lands lying between Fifth and Sixth streets on its plan of lots, from the thoroughfare to the ocean, to use as an open space for camp ground and park purposes, and that no implication of a covenant by the association to that effect should be raised. The foregoing recital of the evidence on this point, parol and documentary, throws light upon the plan of the association and the reservation of the camp ground, &c.

The general scheme for the use of the lands of the Ocean City Association was part of its original organization as a corporation. Its detailed development is indicated at every step in its

progress. The association invited purchasers to buy lots because of the supposed attractions of the general scheme. Its very first advertisement of public sales of its lots, quoted above at length, promised to purchasers that the space five hundred feet wide from the thoroughfare to the ocean, with plenty of tenting ground, should be allotted to the encampment. In making the two public sales the officers of the association renewed the assurances and distributed maps indicating the lay of the land. Reports of sales were made to the association by its officers who had conducted them, reciting the attractions of the camp and park ground. Detailed maps were filed by the association, showing open spaces where the camp and park ground was located and a plan of streets on which were numbered town lots. None were indicated on the camp-ground space. The large map, containing sections A, B and C of the association's tract, delineates the camp ground and park as open space from the bay to the ocean, with all the blocks on the adjoining side lines of Fifth and Sixth streets plotted into town lots. This map was filed and recorded April 19th, 1883, in Cape May county clerk's office. Four blocks of the seven which constitute this open space are specially marked. Two are designated "park," one double block is marked "camp ground," and in the centre of this square "auditorium," and the next block is marked "grove." The other three blocks are plotted as open space, without special marking.

The actual situation on the locality between Fifth and Sixth streets accords with the declarations and documentary proofs. The camp ground and park remained open blocks, while lots bordering on it were sold off for general building purposes.

After all these acts and declarations of the association touching the devotion of the space between Fifth and Sixth streets to this special purpose had been completed for a number of years, the complainant's grantor took his deed from the association in 1891, and the defendant company took its deeds, one in 1896 and the later one in 1899.

An attempt was made to show, by some of the officers of the Ocean City Association, that there was no announcement at their first and second sales of lots in 1880 to the effect that the camp-meeting ground should remain an open space from the thorough-

fare to the ocean. It cannot be ignored, in the consideration of this cause, that the Ocean City Association (whose officers now throw doubt upon the reservation of the camp ground) is weightily interested in securing the discharge of those lands from the implied covenant to leave open, from the bay to the ocean, the space between Fifth and Sixth streets. That tract must now be very much more valuable than it was when the general scheme was proclaimed to lot purchasers at the inception of the proposed improvement. It includes seven blocks of desirable land lying nearly in the centre of the city. If these could be sold off by the association in town lots, at the present increased values, given to them by the many houses built on adjoining lots by purchasers, it would be a very profitable result for the association. This explains its activity in trying to secure from fronting lotowners releases of the camp ground and park privilege, except between Fifth and Sixth streets and Wesley and Asbury avenues, which, if it were effectually accomplished, would enable the association to sell six of those blocks, reserving only the auditorium block for camp ground and park. The association is interested in minimizing, if not in wholly defeating, the reservation of the camp ground and park. Its officers' testimony must be considered with relation to this interest. Their statements denying their oral declarations at the sales are credibly contradicted, not only by the complainant's witnesses, but, to a considerable extent, by the defendants' witnesses. All the documentary proofs oppose them. Some of the reports of sales, contained in the publications of the association, which recognize the reservation of the camp ground and park, were made by the very officers who now testify that at the sales they did not announce the reservations. The many and expensive publications and maps issued, circulated and filed by the Ocean City Association all uniformly refer to the open-space camp ground. They support the statement that these advantages were proclaimed at the sales of lots, and are corroborated, as stated, by the actual fact that this central and valuable location was left open and used only as camp ground and park, and was not dealt with as town lots in any of its seven blocks from 1880 to 1897, though the adjoining lands were so used. Three years ago, evidently by arrangement of the

association, the covenantor, two or three cottages were located on camp-ground blocks. It is straining credulity too far to ask that, in the face of all the proofs here offered, it be believed that there was, in truth, no devotion of the lands between Fifth and Sixth streets, from the bay to the ocean, to the purposes of camp ground and park.

In 1886 the case of *Lennig* v. *Ocean City Association, 14 Stew. Eq. 606,* was decided by the court of appeals. In that case it appeared that Lennig owned several lots, purchased from the Ocean City Association, one at the corner of Sixth street and Wesley avenue, fronting on the camp ground, and two adjoining lots fronting on Wesley avenue. The association had announced its purpose to lease the camp ground in lots for the erection of small cottages for terms of ten years. Lennig, in his bill, declared that the excution of this scheme would be in derogation of his property rights, and would materially interfere with the enjoyment of his dwelling. The court of appeals sustained his right to an injunction on both grounds. It declared that the filing of the maps and the publications of the association, considered with relation to the avowed objects of the association in its articles of incorporation, indicated the adoption of a general plan of improvement, laying out lots, streets, parks and squares, and conveying the lots with relation thereto, and thus obtaining greater prices from the purchasers of the lots. Such conduct, the court held, operated, without express covenant, to bind the grantor not to use the portions devoted to the common advantage otherwise than was indicated in the plans and publications which induced the purchase of the lots. The court declared that the character of the use to which the Ocean City Association devoted the camp ground was "a camp for the purposes of a religious camp meeting, where sojourners could remain a short time under the shelter of tents or other temporary structures."

This exposition of the doctrine of implied covenants by the court of last resort, made in relation to the very transaction involved in the present case, must be accepted as controlling, unless the facts here shown vary, in some essential particular, from those submitted for adjudication in the *Lennig Case.* But the truth is that substantially all the facts there proven are here

again presented, and several additional incidents are here intro-
duced to show that the association influenced purchasers of lots
by holding out as an inducement, in the most public way, its
declaration that the space between Fifth and Sixth streets, from
the thoroughfare to the ocean, should be kept open for camp
meeting and park purposes.

The defendant railroad companies set up several other grounds,
which they insist should lead this court to disregard the declara-
tion of the court of appeals in the *Lennig Case.* They say that
Lennig succeeded in enforcing an implied covenant because his
lots fronted on, and were adjacent to, the camp ground, and re-
ceived especial benefit from having that space left unoccupied
by buildings, whereas, they say, the complainant's lots are at
Tenth street and Asbury avenue, some four blocks away from the
camp ground, and will receive little, if any, injury because of
the construction of the defendants' station. The declarations at
the sales, the publications of the association, its filed maps and
its deeds conveying its lands, will be searched in vain for any
indication that the camp ground and park were to remain an
open space for the benefit of the adjoining or fronting lots. All
lots were sold with the assurance of that open space; all were
to participate in its benefits. The Lennig decision contains no
suggestion that the implied covenant was raised because Lennig
owned a lot fronting on the camp ground. The basis of that
decision is that the association had plotted its lands upon maps
designating streets to be opened and blocks to be used as parks or
the like, and had conveyed its lots to purchasers with reference
to these designations, in modes tending to secure additional
values for its lots because of these inviting incidents. Such
transactions raise an implied covenant by the grantor that he
will devote the specially designated lands to the beneficial uses,
the declaration of which enabled him to sell his lots. A court
of equity enforces such covenants, in order to secure to pur-
chasers of lots the benefits the promise of which induced them
to buy. Neither the acts and declarations of the association nor
the principle as stated by the court of appeals limited the benefits
of the covenant, or the right to enforce it, to the owners of lots
which fronted upon or adjoined the space declared to be devoted

Bridgewater *v.* Ocean City Railroad Co.

to use for camp ground and parks. The space between Fifth and Sixth streets was to be kept open for use as a camp ground and park for religious services, affording a place where large congregations could be assembled in the open air, and protected in tents or temporary structures, with abundant access of light, air and view. Lots, whether near to or remote from the camp ground, were purchased in the expectation that this space should be devoted to the declared use. All purchasers thus acquired a right to have that space used as they had been assured it would be used, for no other than the named purposes. The implied covenant arises for the benefit of all the lots, without regard to their particular locality, in relation to the tract impliedly agreed to be specially kept as an open space. The principle upon which such covenants are enforced is luminously discussed in *De Gray* v. *Monmouth Beach Club, 5 Dick. Ch. Rep. 329,* and in *Mulligan* v. *Jordon, 5 Dick. Ch. Rep. 363 (Vice-Chancellor Green).*

In point of fact, Mr. Lennig, in the reported case of *Lennig* v. *Ocean City Association,* was not enforcing the covenant solely for the benefit of a lot fronting on the camp ground. He asserted his right because of his ownership of three lots, Nos. 698, 700 and 702. An examination of the association's maps will show that No. 698, alone of these three lots, fronts on the camp ground; Nos. 700 and 702 both front on Wesley avenue. See diagram above.

The defendants also insist that the complainant's interest in the performance of the contract is so minute that this court ought not to enforce it; that, in fact, the erection of the defendants' passenger station will confer an actual benefit upon the lotowners. It has already been determined that the act of the defendant is in breach of the implied covenant. Every grantee, mediate or immediate, of the Ocean City Association, the promulgator of the general plan under which all bought, may enforce the covenant made with all. *De Gray* v. *Monmouth Beach Club, 5 Dick. Ch. Rep. 329.* The very object of the courts in raising such implied covenants, and permitting their enforcement by any purchasers under the general plan, is to secure, not damages to the actor in the enforcement, nor an ascertainment of the proportion of injury done to him, but the specific obser-

19

vance of the general plan, for the benefit of all who have purchased the right of that observance. In the *Lennig Case* there was, in fact, no more showing of special injury to Lennig than there is in this case of particular damage to the complainant, but the court granted relief by injunction. In these cases damages afford no adequate relief. What the purchaser loses is the continuous enjoyment of the pledged open space for the uses to which it has been devoted by his grantor, and the growing value of his lands because thereof. No judgment for damages can give him for this the benefit he will receive from the specific performance of the agreement. *Rogers Locomotive Works* v. *Erie Railroad Co., 5 C. E. Gr. 379.*

With regard to the claim that the building of the proposed station upon the camp ground is, in fact, beneficial to the community, the complainant and other covenantees are not required to give up their property rights in the camp ground for the benefit of the public. The suggestion that it is beneficial to the value of the complainant's lot is of the same sort. The thing proposed is in breach of a covenant which the complainant has a right to enforce. The choice of enforcing it lies with him. It is no answer to his suit to restrain the proposed breach to say that it will be, in fact, beneficial to him, that there should be a breach.

The defendants deny that the erection of their passenger station is a violation of the covenant of the association that the camp ground and park shall be kept an open space from the thoroughfare to the ocean.

The evidence shows that the station in question is a substantial building of fixed character, fifty-four feet long and twenty feet high at the peak of its roof, with a shed attached which is forty feet long. It thus interposes in nearly the centre of the space which the association agreed should be kept open a permanent structure, which cuts off the view of the ocean and thoroughfare and free passage of air through the length of the camp ground and park from either side of it. Practically it destroys the unity of the plan for a continuous camp ground and park running from the thoroughfare to the ocean, as was assured in the original scheme.

The consistency of such a permanent structure with the special

Bridgewater *v.* Ocean City Railroad Co.

uses to which it was covenanted the lands between Fifth and Sixth streets should be devoted, has already been passed upon unfavorably to this defence by the court of appeals. In the *Lennig Case* the proposed structures were small, neat cottages to be erected on leases for ten-year terms. These cottages were obviously, by the announcement of the association, to take the place of the temporary canvas tents used by the tenters who come to camp meeting (see *Lennig Case, 14 Stew. Eq. 608*), and were plainly a convenient substitute for the tents. The harboring in tents, erected upon the camp ground, of those who came to attend services, &c., was in entire accordance with the general plan. The essence of Lennig's complaint was not the use of the ground to shelter such attenders, but the proposed accomplishment of that object by erecting on the camp ground *permanent structures,* which would remain after the camp meeting had ended and interfere with the declared purpose to devote those blocks as open spaces for camp and park purposes. The court of appeals made this perfectly clear in its definition of the disadvantages which such permanent structures would bring to lotowners by reason of their interference with the view and with the free passage of air, &c. See *Lennig Case, 14 Stew. Eq. 610.* In effect, that decision holds that one of the very objects for which the camp ground and park were specially reserved must not be accomplished by the erection of buildings which permanently cut off the breezes and the view, thus destroying the use of the camp ground and park, for another object within the special reservation. The railroad station which the defendant companies are building is a permanent structure, having precisely the effect condemned by the court of appeals in the *Lennig Case* as offensive to the implied covenant.

The defendant companies insist that they had almost completed their structure when the complainant filed his bill, and that he had notice that they were building and made no objection. The proof is that the complainant did not go over into that part of the town much, and that the station was nearly half way up before he was aware that the defendants had commenced building it. They began building on June 21st, 1899. The bill was filed August 3d, 1899, and injunction was served August 4th,

1899, these transactions covering a period of forty-four days. The process of construction appears to have been unusually rapid. Assuming that the progress towards completion was regular, the complainant first knew of the defendants' action about the 13th day of July, and filed his bill in this case within twenty-one days thereafter. Substantially all the disadvantages which the defendants suffer by reason of having their building stopped in course of its erection had happened to them before the complainant knew it was being built. It was then half way up. The complainant filed his bill within a reasonable time after he knew the defendants were building.

The defence that the complainant stood by and suffered the defendants to spend their money is dependent upon another incident, and that is, that the defendants must, in order to avail themselves of that defence, have acted in ignorance of the complainant's rights upon which they intruded. If a party has notice that he is building on another's lands, or in derogation of another's rights, he proceeds at his own peril. In such cases it does not lie with him to complain that the other did not object. The deed of December 29th, 1896, under which, by their answer, the defendants claim title, describes the land on which they are constructing their station as in section B "on plan of lots of the Ocean City Association," and two other lots on section C "on plan of lots of the said Ocean City Association." The plan of lots on which sections A and B appear is the map recorded April 17th, 1883, showing the open space for camp ground and park at the very place on section B where the defendants are building their station, so that the plan called for by the deed under which they claim notified them of the special reservation of the lots conveyed to them. Again, on the ground at the place where the railroad station is being built there were physical evidences quite sufficient to put the railroad companies upon warning that those lands were devoted to some use calling for an open space. The uniform use of the side lines of Fifth and Sixth streets for town lots and the leaving the squares between Fifth and Sixth streets as open blocks, nearly in the centre of the city, was an indication that they were devoted to some special purpose. Slight inquiry by the defendants would have disclosed to

them what their use was, if they were, in fact, at any time ignorant of it. The defendants were fairly notified, by all these circumstances, of the outstanding covenant, and were bound by it as was the original covenantor. *Richards* v. *Revitt, 7 Ch. Div. 226.* They also stand in the same place as the covenantor, the Ocean City Association, because they hold by gift and not by purchase for consideration paid.

The defendant companies also contend that the complainant cannot set up the implied covenant against their right to condemn lands, &c., under the General Railroad act and its several supplements. Nothing in those acts authorizes a railroad company to take property for railroad uses in derogation of the rights of owners and without compensation, and without even an attempt to obtain, by previous agreement, a conveyance from the holders in the manner required by the condemnation sections of those statutes. The right of the complainant and other lotholders in the lands in question to have them devoted to the agreed use to which they were promised is a property right, purchased and paid for by them as part of their contract with the association. This right is protected by the constitutional mandate that private property shall not be taken until compensation be first made. This secures the citizen, not only those rights of property of which actual tangible possession may be had, but also in those which render possession enjoyable and valuable. *Pennsylvania Railroad Co.* v. *Angel, 14 Stew. Eq. 329 (Court of Appeals.).*

It has been assumed by the defendant companies that the Ocean City Association might convey the lots in question to them, in disregard of the right of the lotowners to have those blocks from the thoroughfare to the ocean kept open. This is a mistaken assumption. The defendants are voluntary grantees of their lots. They acquired no higher right by their conveyance than the Ocean City Association possessed. The lots conveyed to the defendant company were parts of blocks which were charged, while in the holding of the Ocean City Association, with the implied covenant that they be kept open for the uses declared by the court of appeals. The property right of the lotholders in the lands charged by this covenant did not pass by the association's deed to the defendant company freed from this equity.

On the contrary, the lands still remain charged in the holding of the defendants, the voluntary grantees of the association, in the same manner as if the association yet held them. The defendants are in no sense purchasers for value, without notice.

The defendants also contend that the map section A was the first filed, and thus became the exclusive plan designating the general scheme, and they say that this map did not include the *locus in quo*. But this theory does not accord with the proofs. The general scheme did not originate with the map of section A. This and other maps are illustrative and expository of the plan, but they did not create it. All the evidence goes to show that the plan had its creation in the original organization of the association. In carrying it into effect, in May, 1880, before any map was filed, and before any lot was sold, the association invited purchasers, by public advertisement, to buy its lots on its assurances that there was a general scheme, in following which they declared: "No pains will be spared to give to Ocean City a series of religious privileges equal to other resorts of kindred character." One of these expressly-mentioned privileges was that "the space allotted to encampments is 500 feet wide from thoroughfare to the ocean, with plenty of tenting ground." See the advertisement first above quoted. Every subsequent act, map and publication of the association was consistently in furtherance of this plan. Map of section A, filed in June, 1880, contained nothing inconsistent with the original declaration. It showed both the ocean and the thoroughfare, and while it did not plot all of the blocks between Fifth and Sixth streets and mark them "camp ground," it left them as open spaces, as purchasers had previously been assured they would be left. The fact that the first-filed map containing the lands within section A did not show a complete plotting of all the lands from the thoroughfare to the ocean, in no way lessens the evidential force of its second-filed map as an admission of the camp-ground reservation. This showed not only section A, but also sections B and C, with the seven blocks between Fifth and Sixth streets fully plotted and marked as "camp ground," "grove," "park" or left as open space. See diagram above.

But even if map A were deemed to be the first plotting showing the open camp ground, and did not extend to include the *locus*

*in quo,* it cannot be held to have deprived the association of the power to add to its original proffer and to hold out greater inducements to bidders for lots. If this theory be accepted, the association's filing, on April 17th, 1883, of the map showing sections A, B and C (which both plots and marks the camp ground and park) must be taken as an additional assurance to subsequent purchasers. The complainant's grantor was such a purchaser. The defendant company took its first deed in 1896, after the filing and recording of this map and by description referring to it, and is bound by it, both by notice and by accepting a voluntary deed. The defendants cannot endow themselves with the rights of a *bona fide* purchaser without paying consideration for their purchase.

Both the filed maps and all the publications of the association declaring the special use of this space preceded the making by the association of its deeds to the complainant's grantor and to the defendant company. The evidence is entirely satisfactory to show that the defendants, when they took their deeds, had notice of the outstanding implied covenant, if any notice were necessary to those who merely took the covenantor's place, by accepting a voluntary conveyance of the land charged by the covenant.

The claim that the complainant has lost all right to enforce the covenant because the association has, within the past three years, wrongfully permitted several buildings to be put on the camp ground, is no excuse for the defendants. No such acquiescence of the complainant is proven as charges him with any liability for the association's breaches of the covenant; nor can the defendants, donees of the association, set up the wrongdoing of their donor to protect them against the enforcement of the donor's implied covenant.

The charge that the complainant had filed his bill in this cause and was prosecuting his suit in bad faith, in the interest of rivals of the defendants, and to prevent the latter from successfully carrying on their business, was conclusively refuted as a matter of fact. It is therefore unnecessary to consider its legal significance.

Upon the whole case, the complainant is entitled to a decree according to the prayer of his bill of complaint, with costs.