AUSTIN J. BOZARTH

*v.*

EGG HARBOR CITY, a municipal corporation.

[Submitted February 23d, 1918.   Determined February 25th, 1918.]

1. Where a filed plat showed parcels of ground designated as parks by name, and lots were sold by references to such plat, there was a dedication of such parcels to the public.

2. One buying lots within a city with reference to a plat designating certain squares as parks and public market places, has private rights therein in the nature of easements, and where the vendor subsequently deeded them to the city with the reservation that they be used for such purposes, the legislature had no power to authorize the city to sell them for commercial purposes, and they could not be sold under *P. L. 1915 p. 642* or *P. L. 1890 p. 530.*

On hearing on bill for injunction.

By this suit complainant seeks to enjoin defendant municipality from selling a certain block of land situate in that municipality and known as "Turner Park;" also another similar block known as "Singer Park;" also a third tract comprising three blocks and known as "Market Places."

The case has been submitted at final hearing on an agreed statement of facts.

It appears by the statement of facts that the Gloucester Farm and Town Association was incorporated in the year 1854 for the purpose of buying, selling and improving real estate, and soon thereafter acquired a tract of land containing in area several thousand acres. Defendant municipality was incorporated in the year 1858 (*P. L. 1858 p. 385*) and embraces territorially a portion of the original Gloucester Farm and Town Association tract. By its corporate act defendant municipality is given power to purchase, hold and convey real estate and to establish public grounds. The land here in controversy is within the corporate boundaries of defendant municipality.

In the year 1865 the Gloucester Farm and Town Association filed in the clerk's office of the county a map of its lands. That map divides the entire tract, including that part within the boundaries of defendant municipality, into blocks by the delineation of intersecting streets; each block so delineated on the map was numbered, except a few which were marked with inscriptions which indicated that they were set apart for public use and were not to be sold for private uses. A lithographed copy of that map forms a part of the stipulated facts and is marked *Exhibit A*. On that exhibit one of the blocks here in question is the extreme southwesterly block of a tier of unnumbered blocks extending northeastwardly and southwestwardly across the entire tract and forming the northwesterly boundary of defendant municipality. That tier of blocks is marked on the map "Gardens," and the said southwesterly block of the tier is marked "Turner Park." The right of the municipality to sell that block of land marked "Turner Park" is drawn in question in this suit. A similar tier of unnumbered blocks, parallel with the other tier and forming the southeasterly boundary of defendant municipality, extends across the map; the extreme southwesterly block of that tier is marked "Singer Park." The right of defendant municipality to sell that block also is in question in this suit. The other tract drawn in question by this suit

is now known as "Market Places;" it comprises three blocks of
land, one numbered on the map 320, one containing no number
on the map, but obviously intended to be block 444, the other
numbered on the map 435. These three blocks are separated by
streets and are all adjacent to a street in which is delineated a
railway marked "Camden & Atlantic Rail Road." There also
appears on the map an octagonal drawing which extends in part
on each of the three named market blocks and also extends over
the railroad street, with the word "Station" written in it. This
delineation, standing alone, indicates that the parts of these
three blocks which are covered by the octagonal drawing are oc-
cupied by or are to be used as a railroad station for the railroad
shown on the map.

January 16th, 1872, another map was filed in the county
clerk's office; that map is now commonly known as the official
map of defendant municipality. That map subsequently became
lost from the files of the clerk's office and a duplicate thereof
was filed in the clerk's office March 3d, 1886; a copy is marked
in the stipulation *Exhibit B*. That map embraces only that
part of the tract of the Gloucester Farm and Town Association
which is within the corporate limits of defendant. The stipula-
tion filed herein states that this map (*Exhibit B*) is a *fac-
simile* of the original map of 1865, except in that the 1865 map
covered additional territory; but a comparison of the two maps
shows differences which may be of importance. In the 1872
map the several numbered blocks are subdivided into lots, whereas
in the 1865 map the method of subdivision of blocks is dis-
closed by a small drawing to an enlarged scale below the map
proper. While on the 1865 map the tiers of blocks forming the
extreme northwesterly and southeasterly boundary of the mu-
nicipality were unnumbered and were marked "Gardens;" in
the 1872 map these "Garden" blocks are numbered, and are also
subdivided into lots, and the name "Gardens" is omitted. In
both maps the extreme southwesterly lot of each of these two
tiers of lots is left blank without number or other marks except
the words "Turner Park" as to one and "Singer Park" as to the
other. In the 1872 map the territory which is referred to in the

stipulation as the Market Places is delineated in a manner materially different from that of the earlier map. In the 1872 map the three blocks are left blank except as to the following marks: Each block is numbered in its centre, the numbers corresponding to the former map; lot 320 has the words "Market Pl." written across it; lot 435 has the words "Stuben Pl." written across it; no words are written on the centre lot; also a line is drawn across each lot at the place where the octagonal drawing shown on the earlier map would extend to. The stipulation does not specifically state whether this 1872 map—which map is now commonly referred to as the official map of the municipality—was filed by the Gloucester Farm and Town Association or by defendant municipality; although the stipulation appears to assume that it was filed by the former. It is referred to in the exhibit about to be considered as a special map of the Gloucester Farm and Town Association.

By deed bearing date January 21st, 1871, and recorded January 27th, 1872, the persons then holding the legal title of the lands of the Gloucester Farm and Town Association in trust for the use of that association executed a conveyance to defendant corporation which is marked *Exhibit C 2*. The consideration and granting part of that deed is expressed as follows:

"Now this indenture witnesseth that the said parties of the first part, for and in consideration of certain valuable papers delivered and credits given by the said party of the second part, estimated at ten thousand dollars, as for and in consideration of the sum of one dollar well and truly paid by the said party of the first part at and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, have granted, bargained, sold, released and confirmed, and by these presents do grant, bargain, sell, release and confirm unto the said city of Egg Harbor City, party of the second part, their successors and assigns, all those certain parcels and lots of land, avenues, streets, back-streets, Public and Market places and other real estate, situate in Egg Harbor City in the county of Atlantic and State of New Jersey, known and designated on a special map of the said Gloucester Farm and Town Association, comprising all the lands situate within the boundary lines of said Egg Harbor City, which said map bears even date with this conveyance and is filed in the office of the clerk of Atlantic county the 16th day of January, A. D. 1872, as follows:

"1. All avenues, streets and back streets to wit:"

Then follows a specific description of what appears to be all the streets in defendant municipality. The deed then proceeds:

"2. All the following public places, to wit:"

Then follows, first, a specific description of what is called in the description "The City Park." That description includes. what is delineated on both maps as "City Park." Then follows a description of the market places here in question in the following language:

"And further the Three Market Places between Cincinnati and St. Louis avenues and Agassiz street and Atlantic avenue designated on the plan aforesaid as blocks No. 320, No. 434, and No. 435, containing thirteen and a half acres more or less (being subject however to a certain permission given to the Camden and Atlantic Railroad Company to locate a Depot at the southeast portion of these Market Places), bounded and described as follows:"

Then follows a specific description of the three blocks by metes and bounds. The deed then specifically describes six additional tracts, each of which is referred to in the description of it as a "Market Place." These six market places are not delineated on either of the maps as such. Then follows: "And also the Singer Park, bounded and described as follows:" Then follows a specific description by metes and bounds of the block marked "Singer Park" on the two filed maps. Then follows: "And also the Turner Park, bounded and described as follows:" Then follows a description by metes and bounds of the block marked "Turner Park" on the two filed maps. The deed then proceeds: "And all the following lots of land intended for school localities, to wit:" Then follows specific descriptions of. various lots, none of which appear to be marked on either map differently from other lots. Then the following occurs:

"And it is hereby particularly remarked and conditioned that all the above named and described Public Places and avenues, streets and back streets are forever to remain public for the purposes they have originally been set apart and reserved by the Gloucester Farm and Town Association."

Then follows:

"3. The Gloucester Lake with a sufficient number of lots necessary for the successful use of the Water Power. The Gloucester Lake including a surrounding promenade ground being permanently fixed by the said Gloucester Farm and Town Association within the following boundaries, in which form and limits it is to remain as a Pond forever, to wit:"

Then follows a specific description of the lake by metes and bounds and a description of various lots comprising territory adjacent to the lake. Then follows a description of two blocks called "The Brick Yard." Then follows a description of a portion of "the water front on Mullica river," with a proviso excluding adjoining land. Then follows a description of two tiers of lots on either side of Antwerp avenue; the lots described pass Gloucester lake and City Park at the southeasterly boundaries of that lake and park and include the territory between that lake and park and the tier of blocks marked "Gardens" on the original map which formed the southeasterly boundary of the municipality. The deed then proceeds:

"Together with all and singular the buildings, improvements, ways, rights, liberties, privileges. hereditaments and appurtenances to the same belonging or in anywise appertaining and the reversions and remainders, rents. issues and profits thereof; and also the estate, right, title, interest, possession, claim and demand whatsoever, both in law and equity of the said parties of the first part of, in and to the said premises with the appurtenances; to have and to hold the said premises with all and singular the appurtenances unto the said City of Egg Harbor City party of the second part their successors and assigns forever; subject however to the exceptions and limitations expressly mentioned in this conveyance."

Then follows a warranty of title as against the vendors or persons claiming under them.

The entire scope of the provisions of this deed are herein set forth, although in this suit only the two parks and the tract forming the three market places are brought in question. The descriptions in the deed of those tracts and of the streets, it will be noted, is followed by the express condition that they "are forever to remain public for the purposes they have originally been

set apart and reserved by the Gloucester Farm and Town Association;" and in the description these three tracts are defined respectively as parks and market places.

In the year 1890 (*P. L. 1890 p. 530*), the legislature passed an act referring specifically to this conveyance and reciting that whereas certain public places and school-house lots specifically enumerated in the act had been conveyed by the deed to Egg Harbor City, above referred to, with a condition annexed to the conveyance that said public places and school-house lots were forever to remain public for the purposes they were originally set apart and reserved by the Gloucester Farm and Town Association, and whereas the public places and school-house lots in said city are in locations where they cannot be used by the public for the purposes they were originally set apart; therefore, it was enacted that the deed of conveyance was thereby confirmed and the title to said public places and school-house lots should be held to be fully vested in fee-simple, in said city free of and discharged from the conditions, limitations and restrictions in the deed.

Among the blocks named in the act were the three blocks herein referred to as the three market places. The two parks here in question are not there referred to.

In the year 1915 (*P. L. 1915 p. 642*), the legislature passed an act authorizing any city which had acquired for public use lands and real estate not used or needed for public purposes, or the further use of which, in the judgment of said board or body, is no longer desirable, to sell or exchange or lease such land.

Complainant is the owner of several thousand lots within defendant municipality, all acquired by him during twenty years last past, some of which lots are in close proximity to and overlooking the tracts of land here in controversy. All deeds for lots within the municipality executed since 1872 have been made with specific reference to the map filed in that year.

*Mr. Herbert R. Voorhees,* for the complainant.

*Mr. Herman L. Hamilton,* for the defendant.

LEAMING, V. C.

The principles controlling dedication of land to public use, and the public rights flowing from such dedications, have been frequently defined by the courts of this state. The leading cases are: *Methodist Church* v. *Hoboken, 33 N. J. Law 13; S. C., 19 N. J. Eq. 355; Hoboken Land Co.* v. *Hoboken, 36 N. J. Law 544; Price* v. *Plainfield, 40 N. J. Law 608; Bayonne* v. *Ford, 43 N. J. Law 292; Fessler* v. *Town of Union, 67 N. J. Eq. 14; Borough of Spring Lake* v. *Polak, 76 N. J. Eq. 212.* From these authorities it is apparent that the filing of the map of 1865, and the execution of conveyances of lots by reference thereto, were operative to effect an irrevocable dedication to public use of the two blocks of land marked respectively Turner Park and Singer Park, unless a part of the stipulation filed herein and about to be referred to may be found of controlling force. That part of the stipulation is to the effect that at the time that map was filed the Gloucester Farm and Town Association did not intend the designation of the words "Singer Park" and "Turner Park" to be taken in the sense that those blocks were for public use as parks, but intended to set the blocks aside for the use of two German societies of those names as homes and for private recreation purposes, which societies were organized and maintained by the Gloucester Farm and Town Association for advertising purposes to attract Germans to the proposed German settlement; the stipulation further sets forth that these two German societies in fact secured locations elsewhere for their use, and that these two blocks have never been used for park purposes. In *Price* v. *Plainfield, supra,* Mr. Justice Reed, in speaking for our court of errors and appeals, touching a block of land marked "Park" on a filed map, said: "There is no such uncertainty of meaning as will let in parol testimony to vary or modify it. If the grantors had a different intention, that should have appeared from the papers themselves. The popular and natural meaning should have been so modified, in accordance with the intention. I think that all parol testimony of such intention was incompetent to vary the purport of the mapping, filing and conveyances, and that a dedication was conclusively

effected by such acts." See, also, *Bayonne* v. *Ford, supra,* in which this conclusive force to be given to the word "park," when so used, is declared to be required by public policy. But even though a dedication of these two parks was not effected by the filing of the map of 1865, and the subsequent conveyance with reference to it, the stipulation is not clear that any use of the parks for less than the entire public was intended when the 1872 map was filed; that map and subsequent conveyances with reference to it clearly amount to a dedication of these two parks, and the deed to the city of these parks containing the condition that the "Public Places" and streets so conveyed are forever to remain public, must be regarded not only as a renewed dedication, but also as an acceptance of such dedication by the city. By that deed the naked fee, until then held by the original proprietors, also passed to the city.

The three blocks of land which are known as the market places in some respects differ. from the two parks. The delineation of these three blocks on the 1872 map does not import a dedication to public use; it imports a use by the railroad of a part of the blocks for station purposes, and imports no use of the remaining portion of the blocks inconsistent with unrestricted title of the proprietors. But the filed map of 1872 delineates these three blocks as blank spaces, save as to the numbers placed on the blocks and the words "Market Pl." on block 320, and the words "Stuben Pl." on block 435, and the tracing of what appears to be the exterior boundary lines of the station tract. All blocks on that map, except these three blocks and the two parks already referred to, are subdivided into lots. In the deed to the city these three blocks are referred to as "the Three Market Places" and as being subject to a certain permission given to the Camden and Atlantic Railroad Company to locate a depot on the southeast portion of "these market places." The condition in the deed above quoted also applies to these three blocks. The authorities above cited appear to impel the conclusion that the two maps, taken together, followed by the deed to the city containing the condition above quoted, import a dedication of those three blocks to public use, subject to the right of the railroad company to use a specified portion of them for station purposes.

All that has been said up to this time has reference alone to strictly public rights arising from dedication of land to public use.

But it is unnecessary to determine here whether under the facts disclosed in this case the parks and market places in question are to be deemed to have been dedicated to public use. Distinct and independent private rights may arise in transactions of this nature which this court may protect from invasion.

The leading case touching the nature and extent of such private rights is *Lennig* v. *Ocean City Association, 41 N. J. Eq. 606.* In that case Mr. Justice Dixon, speaking for our court of errors and appeals, says: "Whenever the owner of a tract of land lays it out in blocks and lots upon a map, and on that map designates certain portions of the land to be used as streets, parks, squares, or in other modes of a general nature calculated to give additional value to the lots delineated thereon, and then conveys those lots by reference to the map, he becomes bound to the grantees not to use the portions so devoted to the common advantage otherwise than in the manner indicated." * * * "From this doctrine it of course follows that such distinct and independent private rights, in other lands of the grantor than those granted, may be acquired by implied covenant as appurtenant to the premises granted, although they are not of such a nature as to give rise to public rights by dedication. The object of the principle is not to create public rights, but to secure to persons purchasing lots under such circumstances those benefits, the promise of which it is reasonable to infer has induced them to buy portions of a tract laid out on the plan indicated. *Clark* v. *Elizabeth, 37 N. J. Law 120; 40 N. J. Law 172; Bayonne* v. *Ford, 43 N. J. Law 292.*"

In *Bridgewater* v. *Ocean City Railroad Co., 62 N. J. Eq. 276: affirmed, 63 N. J. Eq. 798,* this implied covenant was enforced at the suit of a lot holder distant from the tract which by implied covenant the land company had agreed to keep open and who had purchased from a grantee of the land company, and was enforced against a purchaser of the restricted space

It follows that in purchasing lots with reference to the map of 1872, complainant came into enjoyment of private property

rights in the nature of easements arising from implied covenants from the town site proprietors that the vacant squares delineated on that map should not be devoted to uses inconsistent with those imported by the map, in the absence of evidence disclosing that complainant knew, or had reason to know, that the squares were in fact reserved for purposes other than the uses which the map imported. As defendant municipality took the fee to these open squares under a deed referring to that map, and under the express condition that the avenues and public places so conveyed to it should forever remain public for the purposes they had been originally set apart and reserved, these implied covenants are necessarily enforceable against the proposed acts of the municipality which are designed to defeat the restricted use.

It remains to consider the effect of the legislation already referred to.

The act of 1890 is designed to discharge "the conditions, limitations and restrictions" contained in the deed.

The act of 1915 is designed to authorize the sale by a municipality of land acquired by it for public use, when the land is no longer needed for such use.

The question here involved does not include a consideration of the power of the legislature to yield up the right of the public in land devoted to a public use by dedication. That power appears to be conceded in *Methodist Church* v. *Hoboken, 19 N. J. Eq. 355,* and in *Fessler* v. *Town of Union, 67 N. J. Eq. 14, 25.* But where private property rights exist in the nature of an easement, touching the use of the land by the owner of the fee, it is obvious that no legislative power can disturb such rights. It is such a private property right that complainant herein asserts and that our constitution protects.

As it is conceded that the proposed sale of these blocks by defendant municipality is for the purpose of enabling purchasers to appropriate the land so sold to manufacturing and other commercial uses and will be operative to effect that result, I am obliged to advise the issuance of an injunction against such sales.