The complainants seek an injunction to prevent the defendant borough from devoting certain dedicated property to a use or uses other than that to which it is alleged it was dedicated and to compel the removal of certain structures erected thereon by or by authority of the borough in alleged violation of the complainants' and the public's rights. The property involved is located in the borough of Belmar and is shown as Silver Lake and the lands immediately surrounding it on the map of property of Ocean Beach Association and which it is claimed was dedicated by the owners of the fee to the public use. The particular relief called for is the *Page 467 
removal of a wooden runway on Silver Lake used in connection with the operation of what is known as a "water scooter" under a concession granted by the borough; the removal of a ticket office erected on the shore of the lake and used in connection with that concession; the removal of an "artificial swan," a boatlike arrangement operated around a fixed point in Silver Lake; the removal of two artificial islands constructed by the borough in the lake; the removal of a bandstand erected in the park at the head or easterly end of the lake; restraint against the defendant borough from using Fifth and South Lake avenues, public streets of the borough, for automobile parking places for hire and restraint against the further filling in and commercializing of Silver Lake. Among the grounds upon which the prayer for this relief is based is the contention that the acts complained of are in violation of implied covenants resulting from the purchase by complainants or their predecessors in title of lots shown on said maps and their conveyance by the Ocean Beach Association, the common grantor.
The land in question was originally owned by the Ocean Beach Association, a corporation created by special act of the legislature on March 13th, 1873. That association purchased a large tract of land and laid it out into streets, plots and lots which now form a large portion of the defendant borough, and filed a map thereof in the office of the clerk of Monmouth county. The first map was filed in 1873, the second map in 1883, and a third map, made in 1895, was filed in 1896. On those maps the land here in controversy, including Silver Lake, was shown as open spaces. Lots were sold at both public and private sale by reference to the map or maps which had been filed and upon the representation that the square land between the easterly end of the lake and the ocean would never be sold but always kept open for the public use, and that the owners of lots on each side of the lake would always have a clear view of the ocean; and that Silver Lake and the land surrounding it would always be open for public use with free access to any part thereof by the inhabitants or property owners of the borough. The *Page 468 
block or square at the east end of the lake was not sold by the association; but after all the remaining lands had been disposed of it was divided into lots and a lot conveyed by the association to each of its stockholders, of whom James E. Barnett was one. All of the property in question has been kept open and freely used by the public since the tract was plotted and mapped by the Ocean Beach Association until the acts of the defendants complained of in this suit and with the exceptions to be hereinafter noted. In 1894, pursuant to an act entitled "An act to provide for the purchase and otherwise acquiring of lands within the corporate limits of towns and boroughs of this state for the purpose of public parks and places of resort for public use, health and recreation and to provide for the improvement and maintenance of the same" (P.L. 1892 p. 54), the borough purchased from the Ocean Beach Association all of the lands involved in this suit in fee, with the exception of the square lying between the easterly end of the lake and the ocean, for a substantial cash consideration.
In 1905 the defendant borough brought suit in ejectment in the New Jersey supreme court against Thomas H. Pryor, Henry H. Bennett and Frank F. Philbrick, subsequent grantees of some of the lots in the square at the east end of Silver Lake, on the ground that those lots were dedicated to public use. There was a verdict for the plaintiff which was reversed on appeal because of error in the submission of certain evidence to the jury. Afterwards relictas were filed by each of the defendants and judgment entered for the plaintiff. Later the borough brought suit in ejectment against James G. Barnett, one of the original grantees of a lot in said square on the ground that it had been dedicated to public use. The verdict was for the plaintiff and it was affirmed upon appeal. Borough of Belmar v. Barnett,77 N.J. Law 559.
In March, 1924, the borough passed an ordinance authorizing the construction of a swimming pool in the square at the east end of Silver Lake and upon the lots involved in the ejectment suit above referred to. Thereupon, certain property *Page 469 
owners of the borough, including Julia Schwarz, one of the complainants in this cause, sued out a writ of certiorari in the New Jersey supreme court, with the result that the ordinance was set aside on the ground that the property in question had been dedicated to the public to forever remain open as a free public park and that the use to which the borough proposed to put that land was a use other and adverse to the purpose of dedication. Hill v. Borough of Belmar, 3 N.J. Mis. R. 254.
The bandstand involved in the present suit was erected by the borough upon the same property upon which it was proposed to construct the swimming pool.
During the winter of 1932 the shore line of Silver Lake was bulkheaded and the land immediately back of the bulkheads was filled in, partly with material dredged from the lake, and during these operations the two artificial islands complained of were thrown up in the body of the lake. This work was done pursuant to resolution of the borough and partly at borough expense. On June 28th, 1932, by resolution of borough council the concession for the operation of the "water scooter" was granted to the defendant Peterson for an annual rental of $500, and by lease bearing the same date the northeasterly portion of Silver Lake, being a strip twenty feet wide by six hundred feet long, was leased to Peterson for a "scooter" concession. No public notice of this resolution or lease was given until a report thereof was published in the local papers on July 29th, 1932. The runway referred to was constructed immediately in front of complainants' properties, by either Peterson or the borough in the month of July, and after the execution of the lease. Peterson makes a charge for the use of the boats operating on said runway. At or about the time of the Peterson concession the borough also granted a concession to the defendant Bergen for a revolving "swan" to be operated around a fixed point at the east end of Silver Lake. This was an entirely verbal agreement.
Both the complainants and the defendant borough are common grantees of the Ocean Beach Association. The complainants *Page 470 
Barr and Schwarz reside in the borough only during the summer season, the complainant Barr residing in Philadelphia and the complainant Schwarz in Newark during the winter months. None of the complainants had any knowledge of the acts of the defendants complained of until the latter part of June or the early part of July, except that in January, 1932, Mrs. Schwarz came to Belmar, saw the bulkheading and dredging of the lake in progress and inquired of the borough clerk for a plan of the work which was being done. The borough clerk referred her to the commissioner of streets and public property and she applied to him for a plan of the work. He promised to send her one but never did so. There is no objection, now, however, to the bulkheading or dredging of the lake. There was nothing at that time to indicate that it was the intention of the borough to erect any structure on the public property or to divert its use from that to which it was dedicated. Upon learning of the concessions and the other acts now complained of the complainants consulted counsel and the present bill was filed on August 8th, 1932, and an order to show cause issued theron.
The defendant has interposed the following defenses:
1. That the complainants are guilty of laches.
2. That the complainants are estopped to complain of the defendants' acts.
3. That the remedy, if any, is at law by certiorari.
4. That the acts complained of constitute a proper exercise of municipal authority by the governing body of the borough of Belmar.
Neither the first nor the second defenses can be maintained under the evidence. The complainants acted with reasonable promptitude after notice and there was no conduct on their part which spells an estoppel.
The third defense, in effect, is a challenge of the jurisdiction of this court. The complainants are suing not only in their respective rights as members of the public, as already indicated, but to enforce their private rights arising from the implied covenants in their deeds. There is no doubt of the *Page 471 
power of this court to protect those rights from invasion even though that invasion results from acts of a municipality claimed by it to constitute a lawful and proper exercise of municipal authority. Trustees of Methodist Episcopal Church v. Mayor,c., of Hoboken, 19 N.J. Eq. 355; Lennig v. Ocean CityAssociation, 41 N.J. Eq. 606; Bridgewater v. Ocean CityRailroad Co., 62 N.J. Eq. 276; Fessler v. Town of Union,67 N.J. Eq. 14; Bozarth v. Egg Harbor City, 89 N.J. Eq. 26.
In Fessler v. Town of Union, Vice-Chancellor Pitney, in commenting on the nature of the proceedings, said (at p. 15):
"The object of this bill is to restrain a nuisance in the nature of a purpresture. It is also, in effect, a bill by acestui que trust to restrain a breach of trust by a trustee."
And (at p. 28):
"But I think, upon general principles, the complainant must have a right of equitable action, otherwise the inhabitants not especially interested in the existence of that square might unite and elect a common council which might be so far recreant to its duty and regardless of the rights of the landowners as to obliterate the square absolutely and to devote it to business purposes."
That language is peculiarly applicable here. In so far as the public rights are concerned, the borough is the custodian of those rights for the benefit of the public and stands in the position of a trustee; and a trustee will not be permitted to gain any advantage or increase his power by a breach of his trust. Fessler v. Town of Union, supra.
And while I think there can be no serious question but that all of the lands involved in this controversy have been dedicated to public use (Borough of Belmar v. Barnett, supra; Hill v.Borough of Belmar, supra; Borough of Belmar v. Prior,81 N.J. Law 254) as the same facts shown in those cases prevail here, it is unnecessary to consider in extenso the public rights arising from such dedication. The private rights of the complainants are sufficient to maintain this bill. Bozarth v. Egg Harbor City,supra. *Page 472 
The remaining question is: Do the acts complained of constitute a lawful and proper exercise of municipal authority? In considering this question we need concern ourselves only with the private rights of the complainants. The defendants rely upon the provisions of the act of 1892 pursuant to which the fee of the lands in question was acquired by the borough, and the Home Rule act. P.L. 1917 ch. 152 p. 319; 2 Cum. Supp. Comp. Stat. p. 2321tit. 136 § 3613. These acts do empower a municipality coming within their provisions to devote park lands owned by it to purposes similar to those here complained of and other than those for which such lands were dedicated; but they do not purport to authorize a municipality to invade the domain of private rights and it is clear that they did not and could not do so.
In Trustees of Methodist Episcopal Church v. Mayor, c.,Hoboken, supra, Chancellor Zabriskie said:
"The legislature may have the right, so far as the public is concerned, to annul the dedication, and yield up the right of the public; but they have no power, if the owners of the surrounding lots have the right as appurtenant to their lots to have this square kept open as a public square, to permit its occupation as against them for a town hall; nor to subject the title or fee, which is owned by the complainants, to a different easement from that which encumbered it when they acquired title."
"If the act of 1868 had unconditionally and immediately authorized the occupation of the tract for a city hall, it would have destroyed the easement of the public, and with it the right of the defendants to take possession for the public."
In Strock v. Mayor, c., of East Orange, 80 N.J. Law 619, the supreme court said:
"If land is dedicated to public use for certain purposes, it is not within the power of the municipality or the legislature to authorize the municipality to divert such land to other purposes without first exercising the right of eminent domain and paying to the owner of the fee a proper compensation therefor. But when land has been acquired for public use, as for a park, by condemnation and payment to *Page 473 
the owner of its full value, or by sale and purchase, it seems to be competent for the legislature to authorize the municipality so acquiring it to use it for other purposes."
That language, in part, was quoted with approval by Mr. Justice Case, speaking for the court of errors and appeals in Carroll
v. City of Newark, 108 N.J. Law 323, 331.
But these courts, in referring to the power of the legislature to authorize a use of land by a municipality for purposes other than that for which it was acquired were referring to lands in which the municipality had both the fee and the entire beneficial interest; that is, lands acquired absolutely and without restriction, either by condemnation or by purchase. A case directly in point, it seems to me, is Bozarth v. Egg HarborCity, supra, decided by Vice-Chancellor Leaming in 1918. In that case he held that:
"One buying lots within a city with reference to a plot designating certain squares as parks, and public market places, has private rights therein in the nature of easements, and where the vendor subsequently deeded them to the city with the reservation that they be used for such purposes, the legislature had no power to authorize the city to sell them for commercial purposes and they could not be sold under P.L. 1915 p. 642, orP.L. 1890 p. 530."
In that case the conveyance was made to the city in January, 1872, for a consideration of $10,000. The act of 1890 above referred to specifically authorized the city to depart from the purposes of dedication and purported to discharge the lands from the conditions and restrictions contained in the deed. The 1915 act "was designed to authorize the sale by a municipality of land acquired by it for public use, when the land is no longer needed for such use." Bozarth v. Egg Harbor City, supra. There is no difference in principle between that case and this; in fact, they are practically on all fours. Vice-Chancellor Leaming there said:
"The question here involved does not include a consideration of the power of the legislature to yield up the right of the public in land devoted to a public use by dedication. That power appears to be conceded in Methodist Church v. *Page 474 Hoboken, 19 N.J. Eq. 355, and in Fessler v. Town of Union,67 N.J. Eq. 14, 25. But where private property rights exist in the nature of an easement, touching the use of the land by the owner of the fee, it is obvious that no legislative power can disturb such rights. It is such a private property right that complainant herein asserts and that our constitution protects."
See, also, Bridgewater v. Ocean City Railroad Co., supra.
By virtue of the 1894 deed from the Ocean Beach Association the defendant borough acquired the bare fee to the lands thereby conveyed; but it is significant that that deed contained the following restriction applicable to these lands:
"That they be forever kept open as public parks and places of public resort for health and recreation, unencumbered by any buildings or other structures, which would obstruct the view or prevent the access of the inhabitants or owners of property within the limits of said borough to, or upon all parts of said land dedicated to public use."
This is a clear indication that the parties to that instrument did not intend thereby to in any way affect or encroach upon public or private rights therefore acquired in the lands then conveyed.
I think it is clear that the use to which the borough has now put a portion of the property in question is restrictive of complainants' private rights and is a violation of the quoted restriction in the 1894 deed. Obviously the complainants do not have free access to that part of said land occupied by the water scooter and revolving swan or by the ticket office or other structures used in connection therewith. And if the borough may lease a portion of the lake and park to private individuals, it may lease the whole. It has no such right.
There is no doubt in my mind but that in granting the concessions for the water scooter and the revolving swan, the building of runways for the water scooter, the erection of a ticket office on the shore of the lake in connection with that concession, and the erection of the bandstand, the complainants' private rights were violated and that they are entitled to have the continued and further violation thereof enjoined by this court. *Page 475 
On the "park" lands abutting the "water scooter" concession, near the curb line of the street, two signs have been erected. One bears the inscription, "Parking 25c Benefit Unemployment Relief Fund. Sat. and Sun. 35c." The other, "Reserved for Patrons of Water Scooter only. P.D." Obviously this indicates a devotion of public lands — the street — to private use and is violative of complainants' private rights and also their rights as members of the public. Defendants' counsel have referred me to no authority for the practice of the defendant borough in making a charge for the parking of automobiles in streets adjacent to the public lands here involved, and I know of none. A continuance of the practice indicated will be enjoined.
On the return of the order to show cause issued in this cause Vice-Chancellor Bigelow ordered the removal of the bandstand from the square lying at the east end of Silver Lake and this order has been complied with.
I will advise a decree in accordance with these conclusions.