FANNIE FESSLER

*v.*

THE TOWN OF UNION.

[Submitted May 9th, 1903. Decided October 17th, 1903.
Filed July 9th, 1904.]

1. In case of the dedication of a square to the public, while the bare legal title remains in the dedicator in trust for the use expressly or impliedly declared in the dedication, the right of possession vests in the municipality, which holds a sort of secondary title in trust for the purposes of the dedication.

2. The owners of lots bounding on a public square have a private right, over and above that of the public at large, to have the square kept open.

3. The filing in the county clerk's office of a map, platted into streets and lots, surrounding an open square marked "Liberty Place," in the centre of which a pond was marked, trees being designated around the edges, and the selling of the lots by reference to the map, constituted a dedication to the public as an open pleasure ground, which did not extend to the use of the square by the municipality for a public building.

4. The legislature has no power to alter or extend a dedication of a public square, as against one owning lots bordering thereon, and sold to him with reference thereto.

5. *P. L. of 1866 p. 521 ch. 214,* authorizing a town in which a square surrounding a pond had been dedicated to the public to fill up the pond, grade and improve the property, and continue a street over and through it, and providing that such square should be town property, gave no power to the town to erect a building on such square.

6. The wrongful erection of a building by a town on a square dedicated to the public is a breach of the trust under which the town holds the

property, of which it can take no advantage unless acquiesced in by the *cestui que trust*.

7. Consent by a property owner to the erection of a building on a public square cannot be construed as a consent to the erection of other buildings thereon.

8. An encroachment on a public square is an offence punishable by indictment only, and one of the public cannot maintain an action or suit therefor unless he is individually and peculiarly injured thereby.

9. The owner of lots fronting one hundred and fifty feet on a public square, whose house lot is within thirty feet of a bell tower wrongfully erected by the municipality, to be rung in case of fire, suffers a peculiar and individual injury thereby, such as to enable her to maintain an individual action therefor.

10. The fact that adjoining lot owners similarly situated have not joined in such owner's suit, nor brought suit on their own account, does not prejudice her rights.

11. A lot owner who suffers a peculiar and individual injury by the wrongful erection of a tower on a public square by the municipality, may maintain an action against such municipality on account of its breach of trust in that behalf.

12. A municipality, cognizant of its lack of right, advertised for the construction of a tower on a public square without notice to an adjoining lot owner, who was incapacitated to transact business for herself. Her agent had no notice of the proposed action until material was brought on the ground, when he at once protested verbally and promptly employed counsel. The contract for the erection of the tower was dated February 8th, 1901, and filed with the town clerk February 19th, and the materials for the tower were probably not brought to the square for some time. The preparation of the bill required considerable investigation and compilation, but was filed, with affidavits, as soon as possible under the circumstances, viz., April 10th, 1901.—*Held*, that the bill was filed with reasonable promptness.

13. A property owner suing a municipality for the wrongful erection of a tower on a public square, and praying for its removal, with other relief, is entitled to a decree for the removal of the tower, it being an inexpensive one, capable of removal and re-erection without serious injury.

The object of this bill is to restrain a nuisance in the nature of a purpresture. It is also, in effect, a bill by a *cestui que trust* to restrain a breach of trust by a trustee.

The complainant is the owner of ten lots, each twenty-five feet by one hundred feet, and each facing on Franklin street, in the town of Union, in the county of Hudson. The rear of six of which lots, and also the rear of two other lots of the same size which do not face on Franklin street, she alleges bound

upon a public square which was dedicated to the public by the owners of a tract of land which comprised the complainant's lots, and many others in the neighborhood, by the usual mode of laying the plot out in streets and lots, filing the same in the county clerk's office and selling· and conveying lots by reference to the map.

On that map appears a plot of land not laid out in streets, but so marked as to dedicate it to the public.

(A copy of so much of that map as comprises the plot in question and complainant's holdings is annexed.)

The nuisance of which she complains is the erection of a fire-bell tower on that square and within about thirty feet of her premises. The structure is composed of iron posts, beams and braces.

The defendant claims no legal title to the premises on which the fire-bell tower is erected except such as is derived from the same acts of dedication upon which the complainant relies, and a sort of adverse possession or user of some part of the square which, however, does not include the *locus* of the tower.

Some time prior to the year 1852 the land in question was part of a tract of about forty-five acres, the property of the Hudson County Real Estate Company, and was surveyed in that year and laid out in streets, lots, &c., by William Hexamer, who filed in the clerk's office a hand-made map of it March 15th, 1855. This map does not appear to have the clerk's endorsement on it. At the same time there was filed, and so marked by Mr. Gilchrist, then county clerk, a lithograph copy of that map with some additions.

These lithographs, as might be expected, were made in great numbers and handed to all purchasers. In fact, a large number, if not all, of the lots were disposed of by a sort of lottery or raffle among the members of the association and the lithographs distributed to them for the purpose of reselling, and all conveyances were made by reference to it.

The tract is bounded on the southwest by the Hoboken and Hackensack turnpike, and was laid out in streets at right angles to each other and nearly on north and south and east and west courses, but cutting the Hoboken and Hackensack turnpike at an acute angle.

To the northeast of and parallel with that street was laid out a street called Kossuth street, which also cuts the other streets on the map at an acute angle.

The lots laid out on the map are nearly all twenty-five feet by one hundred feet in size, and are all separately numbered on the map, and the evidence indicates that the town has been built up in accordance with that map.

On that map one of the streets, running north and south, was

called Hutton street (now called New York avenue); another, running east and west, was called Franklin street. One hundred feet south of Franklin street, on the east side of Hutton street, was left on the map an open space one hundred and fifty feet wide, three hundred and thirty feet along on the east side and two hundred and twenty feet along on the west side next to Hutton street, making an acute angle at the southeasterly corner thereof. On this space on the map is laid down a small lake shaped like an elongated egg, and extending from about seventy-five feet from the southeast corner to within about forty feet of the northwest corner and marked "Indian Pond," and southwest of it is printed the words "Liberty Place." In the northeast corner, between the pond and the angle, is laid down a small triangular plot, as if for a flower-bed. Kossuth street, if its lines were continuous, would cross the pond diagonally.

In nearly the centre of the lake is marked an island with a tree on it, and on each side and on the southerly end a row of trees is marked.

On the hand-made map the pond is somewhat smaller and does not extend so far to the southward, and no trees are laid down on it except one on the island, and no mark of a triangular inclosure is found to correspond with that on the lithograph.

The proofs show that there was at the time of the making of the map, and for years afterwards, an irregularly-shaped pond of stagnant water, which varied in depth and size with the condition of the weather. The drainage was to the southward, and the ground to the north and east of it was comparatively dry and solid.

At the time of making the map and selling therefrom there were no trees except that on the island in the middle of the pond.

Most of the lots owned by complainant face on Franklin street and six of them abut in their rear on this vacant lot.

There was also laid out on this map, on the east side of the said square, seven lots, numbering from 429 to 435, inclusive, of which lots complainant owns 429 and 430, which are immediately in the rear of four of the lots which she owns facing

on Franklin street.  These seven lots did not front on any street and, with the exception of number 435, had no outlet on any street, and the only access to them from the public highway was over this square.

Of these lots numbers 431, 432 and 435 were conveyed by the Hudson County Land Company to several purchasers by a description which expressly bounded them on "Liberty Place."

On the 15th of June, 1857, the Hudson County Real Estate Company made a lease to John Ehlers, by which they demised and let to him the square in question by the following language:

"All that certain lot, parcel or tract of land and land under water situate in the township of North Bergen aforesaid, and which on a certain map of property belonging to the said The Hudson County Real Estate Company, made by William Hexamer and duly filed in the clerk's office of the said county of Hudson on the fifteenth day of March, A. D. 1855, is marked, designated and laid down as Indian pond, together with the land and premises surrounding said pond, and unnumbered and not laid out into lots as shown on said map, a part of which is known and designated as 'Liberty Place,' bounded westerly by Hutton street, northerly by lots No. 378, 379, 380, 381, 382 and 383; easterly by lots No. 429, 430, 431, 432, 433, 434, 435 and 476, and southerly by lots No. 474 and 475, as said street and lots are laid down on said map, respectively, excepting and reserving to the said parties of the first part, out of the said premises above described, a space of twenty-five feet wide immediately along the line of said lots above mentioned for a public road, so as to allow a public way all around said pond, which public way is to be immediately adjoining the lots above mentioned,"

for the term of ten years at an annual rental of $30, to be paid "to the trustees of School District No. 6 in said township for the time being for the use and to be applied by said trustees for the education of poor and indigent children at Union Hill in said township," with privilege of renewing for ten years.

In 1856, after the raffle had taken place and many of the conveyances made, two common law judgments, aggregating less than $2,000, were recovered against the Hudson County Real Estate Company and all the premises comprised in the map were sold at sheriff's sale on or about December 20th, 1859, to Frederick Baare, Jacob Schweitzer and John Ehlers, in whom, or their survivors, the record title to the park in question is now vested.

They subsequently made conveyances to the holders of title to such of the lots as had been disposed of by lottery upon payment of a small sum of money by each.

The probability is that this was done to cure any defects which might have arisen in the title by reason of the decision of the court of errors and appeals in *Wooden* v. *Shotwell,* in 1854, reported in *23 N. J. Law (3 Zab.) 465,* and same case, affirmed on appeal, *24 N. J. Law (4 Zab.) 789.*

The town of Union was incorporated in 1864 by an act of the legislature, approved March 29th, 1864.   *P. L. of 1864 p. 561 ch. 330.*

In 1866 the legislature passed a supplement to that act, which supplement was approved March 20th, 1866.   *P. L. of 1866 p. 521 ch. 214.*

Section 13 of that supplement provides as follows:

"That the said council shall also have power and authority to fill up the pond and grade and improve the property surrounding the same, as the same is laid out and designated on the map,entitled map of the property belonging to the Hudson County Real Estate Company, known as Union Hill; the said pond known as Indian pond, and certain property surrounding the same, having been laid out on said map for public use, and, in case said council think proper so to do, continue Kossuth street through and over the same; and the said pond and the property surrounding the same thus laid out for public use shall also be town property."

The authorities of the town, some time prior to the year 1891, had granted leases or permissions to various persons to erect temporary buildings on some portions of the square, and two small structures were erected immediately in the rear of complainant's dwelling, which, it is proper to observe, occupies a portion of the fourth lot to the east of Hutton street, or New York avenue, the three adjoining lots to the west thereof being used as a yard.

Some time after the year 1891, as the result of a petition of the property owners, including the complainant, all those temporary buildings were removed, leaving the square originally laid out entirely free from the encumbrance of any building with an exception presently to be stated. The pond was more or less obliterated, and Kossuth street was extended through it, thus

bisecting the square and leaving much the larger portion thereof between that street and the rear of complainant's property. The title to the lots owned by complainant was vested in her husband in 1884 and came to her by his will in 1887.

In the year 1891, the defendant, being desirous of erecting a building for fire department purposes, determined, if practicable, to place it on this "Indian Pond" lot.

Objection was made by complainant through her son-in-law, Mr. Worth, who attended to her business, the complainant being unaccustomed to business, besides being in feeble health.

The defendant consulted its counsel, Mr. Russ, who prepared an elaborate and well-considered opinion, coming to the conclusion that the defendant had no right to place any structure on the square. Nevertheless the defendant decided to proceed with the building, if no one objected, and it succeeded in obtaining Mr. Worth's consent, upon condition, as he swears, that the erection should be temporary in its existence. The result was that a hose house about twenty-five feet wide by forty feet deep was erected on the east side of New York avenue, thirty feet south of complainant's property.

Affairs stood in this condition until the winter of 1901–1902, when the defendant determined to erect the fire-bell tower now in question. It was erected fifty feet in the rear of the hose company house and thirty feet distant from complainant's rear line and almost directly in the rear of her dwelling.

There is no proof that complainant had the least notice that defendant intended to erect this building until her son-in-law saw the material (mainly iron beams, ready to be assembled) brought upon the ground. The exact date is not given, but the contract was accepted February 19th, 1902. He immediately protested to one or more of defendant's officers, threatened a suit, and called on and attempted to employ Mr. Russ, who was not then town counsel; failing in this, he applied to and retained Messrs. Crouse & Perkins. They, as soon as practicable, prepared a bill and affidavits and applied to this court for an injunction, but as the building was partly constructed before the application was made the court declined to impose an *interim* restraint and the case was brought to final hearing.

*Mr. Randolph Perkins,* for the complainant.

*Mr. Frederick Frambach, Jr.,* for the defendant.

PITNEY, V. C.

Upon these facts the following questions arise:

*First.* What was the scope and purpose of the original dedication?

*Second.* Has that scope or purpose been altered or enlarged by either (*a*) the legislation above cited, or (*b*) by any subsequent occurrences?

*Third.* Is, or was, the complainant, at any time, as the owner of lands abutting on the square, entitled to relief against the proposed erection?

*Fourth.* If so, has she in any manner lost or waived that right?

Upon most of the foregoing questions it seems to me that the law is so well settled in New Jersey as not to admit of doubt.

The leading authority is, of course, the case of *Methodist Church, &c.,* v. *Mayor, &c., of Hoboken, 33 N. J. Law (4 Vr.) 13,* and the numerous cases which have followed it.

It is impossible to distinguish that case from the present, so far as the dedication goes.

It is laid down as a general rule that the bare legal title remains in the dedicator.

In this case it appears that it remains in the three men who bought in the property, including the square, at a sheriff's sale on a common law execution. They have made no conveyance of the title to the "Indian Pond" lot.

The rule is generally stated to be that while the bare legal title remains in the original dedicator in trust for the uses expressly or impliedly declared in the dedication; in case of the dedication of a street or public square the right of possession vests in the municipality, which holds a sort of secondary title in trust for the purposes of the dedication; and that is the precise position of the defendant here.

No case was cited to me by counsel where the precise scope and

purpose of such a dedication and the duties and powers of the municipality were drawn distinctly in issue, but the subject was treated by Mr. Justice Depue in the *Hoboken Case, 33 N. J. Law (4 Vr.)* at *p. 17.* There the piece of land was marked on the map of dedication as "Square" simply, and the learned justice says: "The word 'square,' on this plot of ground, indicated a public use, either for purposes of a free passage or to be ornamented and improved for grounds of pleasure, amusement, recreation or health. That is the proper and natural meaning of the term and its ordinary and usual signification. It is unquestionably true that the owner might, in the act of dedication, have declared the special public use to which he intended to donate the lands, and they would have remained subject to such uses. In this case he has not done it. There was nothing to indicate such special use in the original map. The word 'square,' as a term of dedication, imported a complete and unrestricted abandonment to the public uses above indicated."

Again (at *p. 19*) he says: "But the power of the local corporate authorities is vested in them only as the representatives of the public and for the protection and regulation of the public use. *They cannot sell the lands so dedicated, nor release or extinguish the uses for which they were dedicated, nor employ them in any way variant from the purposes for which they were designed.* But within the limits of the purposes and uses for which the dedication is made—to regulate the use—the authority of the local corporate authorities is unlimited, against which no mere private right can be set up."

Mr. Justice Whelpley, in *Jersey City* v. *Morris Canal, 12 N. J. Eq. (1 Beas.) 547* (at *p. 554*), uses this language: "Whenever the public, by an express municipal act, accepts the dedication, the public duty of putting the land to the use to which it was dedicated arises."

In *Price* v. *Inhabitants of Plainfield, 40 N. J. Law (11 Vr.) 608,* the effect of the word "park," being written on the face of a map, was discussed, and Mr. Justice Reed, speaking for the court of errors and appeals, uses this language:

"Had the word 'square' been upon the map, I suppose there

would hardly have been a contention but that it worked to-gether with the other acts—a dedication. If the words 'public park' had been upon it, no question would have arisen. But a park in a city means to the sense of every person a place open to everyone. It carries no idea of restriction to any part of the public or to any specific number of persons. Restrictions as to time of entrance or behavior of those entering are conceivable, but the idea that any class of the community is to be excluded would not be entertained primarily by any person in connection with the idea of a park within the limits of a city. That it was to be a place of public resort would be the impression which any person would receive by looking at the map in this case, delineating a tract of sixty acres with streets and a square or block upon which is marked 'Park.' "

In *Bayonne* v. *Ford, 43 N. J. Law (14 Vr.) 296,* Chief-Justice Beasley uses the following language: "It was truly said that when a dedication of this kind obtains, *the local corporate authorities take the interest so created in trust as the representatives of the public, and that they cannot sell the lands so dedicated, nor release nor extinguish the uses for which the dedication was made;* and the theory therefore would be utterly inadmissible, even if the fact were that the corporate authorities of Bayonne had laid out the road in question, that thereby they forfeited rights that belonged not to themselves but to the public at large. In point of fact, the street in question was not laid out by the city of Bayonne, but by special commissioners appointed under a special statute. The action of such officers had no effect in the way of destroying the public rights now in question."

Now I think the word "Place," as used here, in connection with the map showing the pond with the trees (which had not yet been planted) about it, had the same meaning as the words "square" or "park."

It was a perfectly clear expression of the purpose of the donors that the space should be used for a pleasure ground for the public. There was, besides this, the evidence of two old gentlemen, who had been members of the Hudson County Real Estate

Company, that such was the intention of the company, as expressed among themselves.

In this respect the case resembles the case of *Weger* v. *Delran, 61 N. J. Law (32 Vr.) 224.* There no name was placed on the square, but it was simply not laid off into numbered lots, and there was proof of the dedication of the donor.

The learned judge says (at *p. 226*) : "Although the map did not designate this block in words as a 'square' or 'park,' yet it contained persuasive evidence that it was intended for a different use than that to which the other blocks were designed to be put, and from Bechtold's acts and declarations, which were admissible evidence, there was the plain inference capable of being drawn that he intended to dedicate the block to public use, as was found by the trial judge in accordance with the cases in this state respecting the dedication of lands to public uses."

The case of *Methodist Church* v. *Hoboken, 19 N. J. Eq. (4 C. E. Gr.) 355,* arose in this wise: After the decision by the supreme court of the case of *Methodist Church* v. *Hoboken,* above referred to, parties interested procured an act of the legislature authorizing the city of Hoboken to purchase from the church the premises in question at a price not exceeding $10,000. Not being able to agree, the city sued out a writ of *habere facias possessionem* and the church applied for an injunction.

Chancellor Zabriskie lays down the precise rights and estate of the original dedicator, the city and the public, as follows:

"The title or fee of the land is in the complainants. That title is subject to an easement which belongs to the public, which is the right to have it kept open and enjoyed as a public square. The defendants have no estate in it; their only right is the power and duty, as representatives of the public, to see to it that the public are not hindered in the enjoyment of their rights there; and to effect this, they may maintain ejectment against anyone who takes possession of and occupies it to the exclusion of the public.

"The legislature may have the right, so far as the public is concerned, to annul the dedication and yield up the right of the public; *but they have no power, if the owners of the surrounding lots have the right as appurtenant to their lots to have*

*this square kept open as a public square, to permit its occupation as against them for a town hall, nor to subject the title or fee, which is owned by the complainants, to a different easement from that which encumbered it when they acquired title.*

"If the act of 1868 had unconditionally and immediately authorized the occupation of the tract for a city hall, it would have destroyed the easement of the public and with it the right of the defendants to take the possession for the public."

I think this statement of the law governing the subject is entirely accurate, and I desire to emphasize the distinction made by Chancellor Zabriskie, and which seems to me clearly to exist between the right of the public at large, including all persons who do not have land bounding upon the square in question, and the owners of lots bounding thereon. I am of the opinion, although, perhaps, it is not necessary to the decision of the present case, that the owners of the lots bounding on the square have a private right over and above that of the public at large to have the square kept open. That right is of the same nature as it would be if the original dedicator in making conveyance to the owners of those lots bounding on the square had covenanted that the square should be for public use and that no buildings should be erected thereon. In other words, they occupy the same position that the co-complainant White occupied in the case of *Watertown* v. *Cowen and Bagg*, reported in *4 Paige 510* (at *p. 514,* bottom, and *p. 515,* top).

Upon principle as well as upon the *dicta* just cited, I am of the opinion that the dedication in this case was for the purpose of use by the public as an open pleasure ground—a ground with trees and a small lake, if the latter was found desirable and practicable; that the dedication did not include the use of it for a public building, and that the defendant had no right under the original dedication to erect any building upon it.

Further, I deny the power of the legislature to alter or extend this dedication as against the complainant. But, granting that power, I find none in the act above cited, so far at least as to the erection of any building thereon.

It is not necessary to determine whether or not the continuation of Kossuth street through the park was within the

original dedication, since such continuation does not affect the questions here involved.

Nor does the declaration in the statute above cited, "that the pond and property surrounding the same shall also be town property," add in the least to the rights of the defendant.

It is a fundamental principle underlying all the cases above cited that the dedication once clearly made is irrevocable and unchangeable.

If, as I hold, the defendant was without authority to erect buildings on the square, then their so doing was a breach of the trust on which it held the right of possession and control of this property; and it is hardly necessary to say that the law ought to be, and is, that a trustee shall not be permitted to gain any advantage or increase his power by a breach of his trust unless it be, and that necessarily to a limited degree, where the breach has been approved and acquiesced in by the *cestui que trust.*

Here, at the request of the *cestuis que trustent,* all the buildings have been removed from the square with one exception, that of the hose house. Granting that for present purposes the complainant should be held to have acquiesced in that erection, yet it is quite clear, on general principles, that such acquiescence does not extend a hair's breadth beyond its actual limits on the ground.

A consent to the erection and maintenance of that building cannot by any correct principle be held to be a consent to the erection of another building in a different place. This seems too plain for argument.

We come, then, to the question of the complainant's standing in this court.

The general rule is that any encroachment on a public highway or public square is an offence against the public, punishable by indictment only, and that one or more of the public cannot maintain an action at law or in equity therefor unless he is so situated as to be injured thereby in a manner and to an extent peculiar to himself as an individual as distinguished from himself as a member of the public at large.

The complainant is the owner of ten lots, comprising a

boundary on the square in question of one hundred and fifty feet in the immediate neighborhood of the tower in question. It is within thirty feet of her house lot, and the existence in that place of the tower and the ringing of the bell in case of fire will, in my judgment, produce an effect injurious to the enjoyment of her property, different in a marked degree to that of the inhabitants generally of the town of Union, which is a closely built town of from fifteen thousand to twenty thousand inhabitants.

There may be a few other lot owners in the immediate vicinity who are interested in the same degree, or nearly so, as the complainant, and they may have the same standing as the complainant, but the fact that they have not joined in this suit, or brought a suit on their own account, cannot prejudice the rights of the complainant, if those rights are, as I suppose them to be, peculiar to her by reason of her vicinity to the square.

But, of course, if I am right in my conclusion that she has, by reason of her owning lands bounding on the square, a right in the nature of a private right, then she has a right in addition to her being a member of the public, which dispenses with the necessity of resorting to the doctrine of peculiar injury.

Next as to her right to maintain an action against a municipality.

No point was raised by counsel for defendant that his client was entitled to any immunity from action if, in point of fact, its action was unwarranted in law; and no case was cited by counsel on either side bearing precisely on this point, nor have I been able to find any.

Moreover, I find no case, in this state at least, where the municipal authorities have ever been charged with a breach of their trust in that behalf.

But I think, upon general principles, the complainant must have a right of equitable action, otherwise the inhabitants not especially interested in the existence of that square might unite and elect a common council which might be so far recreant to its duty and regardless of the rights of the landowners as to

obliterate the square absolutely and devote it to business purposes.

Has the right of complainant been lost by laches in filing her bill?

· The municipal · authorities, being fully aware of their lack of right in the premises, proceeded without notice to the complainant to advertise in the public prints for bids for the erection of the tower in question. It does not appear, and there can be no presumption, that complainant saw any of those advertisements or had any notice of them. At that time she was an invalid. Her son-in-law, who lived with her and looked after her business, swears that he had no notice of the action of the municipality until he saw some of the material brought on the ground. He then, as above stated, protested verbally and employed counsel promptly.

It appears that the contract for the erection of the bell-tower was dated February 8th, 1901, and was filed with the town clerk February 19th, 1901. The tower was a skeleton constructed of iron, and its several parts undoubtedly were cut and shaped and prepared to be assembled before they were brought on the ground, so that it must have been some time later than the date and filing of the contract before they were seen by Mr. Worth.

For some reason, which may be inferred, Mr. Russ declined to proceed.

Messrs. Crouse & Perkins took up the case and prepared their bill and affidavits as soon as the circumstances would permit.

The preparation of the bill required considerable investigation and compilation and necessarily occupied some time. It was filed April 10th, 1901.

I think the bill was filed with reasonable promptness.

An application was made for an injunction, but before the order to show cause could be brought on for hearing the structure was partially erected and no restraint was imposed. The order of discharge was made expressly without prejudice to the complainant.

The prayer is that the materials of the tower may be removed from the ground and for other relief.

It appears that the structure is not an expensive one and that it may be taken down without serious injury to its parts and removed and re-erected in another place.

I think that the complainant is entitled to a decree against the municipality providing for the removal of the tower and of all its constituent parts, and that she is entitled to recover her costs besides a reasonable counsel fee, which I shall fix upon hearing parties.