This bill is filed to enjoin the playing of professional baseball games, to which admission is charged, on a portion of the land transferred in 1924 by the Meadow Land Society of South Orange, a corporation, to the village of South Orange. The games have been regularly played on Sunday. In 1930 twenty-five occurred, all on Sunday afternoon, and all on the premises in question, save one which was played at the Newark Bears' stadium. They were conducted by an organization now or formerly known as the South Orange Baseball Club. All of the members of this baseball team are professional players who do not reside in South Orange. They were paid for their services out of the receipts from the games. Prominent professional baseball teams were hired to oppose the South Orange Baseball Club, and sometimes noted individual baseball stars, as for example, Babe Ruth. The game at the Newark Bears' stadium seems to have been arranged in order to prevent a deficit in the finances of the club.
The deed to the village of South Orange covers about thirty-eight acres of land near the center of the village.
The bill is filed by William T. Baird, individually and as a trustee in dissolution of the Meadow Land Society of South Orange. The corporation duly authorized him to file the bill in its behalf by a resolution of its directors acting as trustees in dissolution.
The defendants named in the bill are, the village of South Orange, grantee in the deed; the Board of Recreation Commissioners of South Orange; Carlton Greene, chairman, and South Orange Baseball Club, Albert Leitch, manager.
Three causes of action are alleged: First, complainant, acting for the Meadow Land Society, prays that the defendants be enjoined from violating the restrictions covering the land in question. The covenant reads as follows:
"It is further understood and agreed that said conveyance shall be made upon condition and subject to the restriction that the premises *Page 93 
above described shall be used solely as a public park or playground or for public park or public playground purposes."
Second, complainant, as a resident and taxpayer of the village and as a member of the public at large, and whose property is injuriously affected by the violation of this restriction, seeks to enforce the covenant and restrain its violation because it inures to his benefit and that of the public at large.
Third, complainant, as a private citizen, seeks to restrain these Sunday baseball games because the peace, quiet and enjoyment of his home on Sunday afternoons are disturbed and destroyed.
The question of the consideration for the deed was considered at some length at the hearing and it has a bearing on the case for this reason. If the money paid was less by a considerable amount than the actual value of the land, it strengthens the complainant's contention that the restrictions were an inducement to the transference of the land and were an integral part of the consideration itself, although I believe that the restrictions should in any event be enforced according to their true intent and purpose.
The village paid $71,300 for the property. Complainant called two real estate experts of unquestioned ability and reputation. One testified that the property at the time of the transfer was worth in round figures $475,000; the other's valuation was in round numbers $400,000. One of defendants' witnesses gave the value at $300,000; another at $180,000. There was still another witness for the defendants, to whose testimony I attach no weight whatever. The reason for this is that he was one of the village assessors. He testified that after taking the oath to assess property according to the constitution, he fixed the value at about $72,000. He then, after taking an oath before me, stated that the true value at the time of his assessment was at least $50,000 higher. It is apparent that his sworn estimate was at one time or the other incorrect and therefore none of his testimony is of any value. From the admissible testimony, *Page 94 
it is plain that $71,300 was far below the market value of the land. Taking the lowest valuation given by a witness for the defendant it was less than half its value, and taking the highest, less than one-fourth. The lowest testimony for complainant makes it less than one-fifth. It seems clear, therefore, that there was consideration in addition to the money paid, which led the Meadow Land Society to convey to the village. That additional consideration was, I believe, the restrictive covenant above alluded to. Complainant testified that he had sought for years to acquire the stock of the society that he might be able to have the land devoted to some public use. He offered it to the Essex County Park Commission for park purposes. When that board declined to accept it, he opened negotiations with the village of South Orange. The negotiations were conducted with Mr. Philip N. Miller, chairman of the special committee of the board of trustees appointed for that purpose. Mr. Miller's testimony is important as a contemporaneous interpretation of the understanding of the village as to the meaning of the restrictive covenant. In his report to the trustees Mr. Miller said: "We have gone a long way toward providing the people with adequate park and playground facilities. By retaining this open space which has meant so much to the village, we take a great step toward maintaining the residential character of our community." Mr. Miller then testified as to a visit he made to the ball field on a Sunday afternoon in October, 1930. He saw a fence covered with canvas shutting off the field from general view. He heard yelling, shouting and stamping. He said, alluding to the purpose to which the village would devote the land: "The purpose was certainly not to ever hold professional ball games on any portion of the land acquired from the Meadow Land Society."
After the conveyance of the land to the village, the trustees transferred a portion of it to the board of recreation commissioners in March, 1928. This was done pursuant to the authority of P.L. 1911 ch. 308 p. 666, and the amendatory acts. In 1929 the recreation commissioners gave the use of *Page 95 
the ground to the South Orange Baseball Club. There was and is no legal authority for this. Mr. Harry J. Schnell was the treasurer of the club, although he had at the time no connection with the village trustee or the recreation commission. This club used the public ground and played professional ball games for which admission was charged. The gate receipts for that year totaled $13,372.34. They were received and disbursed by Mr. Schnell or by a Mr. Coeyman, who likewise had no connection with the village government. This profit made from use of the public lands was almost entirely spent on salaries of players, guarantees to teams, c. There was no control over the fund by any one connected with the village government. In 1930 the village counsel advised the trustees that the method theretofore followed in the conduct of the games was illegal. He suggested, however, that Sunday games could be played under P.L. 1911 ch. 308 ¶7, which reads as follows:
"Said board of playground commissioners, in order to provide the funds, in whole or in part, necessary to improve, maintain and police the playgrounds or recreation places under its control, shall have the power and authority to arrange and provide for the giving of outdoor exhibitions, concerts, games and contests, and the power and authority to use and employ said playgrounds or recreation places for the purpose of giving thereon outdoor exhibitions. concerts, games and contests, and the said board shall have the power and authority to charge and collect a reasonable admission fee for each person entering such playground or recreation place during the time or times when the same is being used or employed for such purposes; provided, however, that the said board shall not use or employ any such playground or recreation place for such purpose for a greater period than eight hours in any week, nor on more than two days in any one week, and when any such playground or recreation place is used for such purpose no admission fee shall be charged or collected from children under twelve years of age."
I cannot agree to the proposition that this statute authorizes the playing of games on Sunday. It provides for games under certain conditions to be played for a period not greater than eight hours in each week, nor on more than two days in any one week. There is no specific permission to include Sunday as one of these two days. On the other hand, the *Page 96 
Vice and Immorality act (4 Comp. Stat. p. 5712 § 1) specifically prohibits the playing of games on Sunday. It is one of the fundamental rules in the construction of statutes that when two are considered they shall be so construed that both, if possible, may be sustained. I do not believe the legislature intended in this indirect way to repeal the Vice and Immorality act. The proper meaning to be given the act of 1911 is that the days specified therein are any week days and do not include Sundays.
Acting under advice of counsel, the Sunday games were continued under the direction of the board of recreation commissioners. As I have said, during 1930 twenty-five games were played, all but one on the premises covered by the restriction. That one occurred at the Newark Bears' stadium. The ball field was fenced in and a canvas covered the fence to prevent the public from looking in. $14,320.16 was collected as admissions. All of this save $313.81 was spent on salaries of players and guarantees to opposing teams. As there was a balance of $736.76 from the admittedly illegal games of 1929, there was a net loss of over $400 in 1930. The expenses of the game at the Newark stadium were $2,912. This included a guarantee of $1,719 to two famous professional baseball stars, Babe Ruth and Gehrig. By what legal authority this guarantee was given does not appear. Books were produced by one Henderson, who says he was assistant treasurer of the fund. In these books the item is marked "guarantee." Henderson denied that the books are those of the recreation commission. Counsel for the defendants, however, stated on the record that the games were conducted by the recreation commission. It seems clear that no legal authority existed for pledging the credit of the village, either directly or indirectly, to stage a professional game by professional players, none of whom were residents of South Orange, on grounds in the city of Newark. All the money was taken in and disbursed by employes of the recreation commission — not themselves members of that board or of the board of village trustees. P.L. 1911 ch. 308, on which defendants rely as their authority for conducting these games *Page 97 
in the manner above described, provides, section 6, that all money received by the board of recreation commissioners shall be paid to the village treasurer and by him disbursed. This was not done. The act further provides, section 7, that admission fees shall be charged only for the purpose of improving, maintaining and policing the playground. None of the money collected at these games was so used. It was all used to pay professional players, guarantee expenses of opposing teams, salaries of employes of the board for their services in connection with the games, and incidental expenses such as advertising in newspapers outside the village, c. The evidence shows that large crowds attended the games. Many automobiles were parked in the streets and on the playground adjoining the field. There was loud shouting, yelling and stamping, especially when an outside team called "The House of David" appeared, accompanied by a clown who performed during the game; or when "The Philadelphia Red Caps" arrived with hot dog and peanut vendors; or when the illustrious Babe Ruth performed in the presence of howling hundreds. For these performances a part of the public lands of South Orange was used, fenced in and shut off from public view — land that was restricted "solely for public park or public playground purposes." I have no difficulty in believing that the peace, rest and quiet of complainant and his supporting witnesses and that of the public, on Sunday afternoons, were thus disturbed.
I cannot believe that the legislature under the act of 1911 intended to permit the municipalities of this state to enter into the business of professional baseball owners, to hire professional teams and to use municipal land for the purpose of financing such undertakings. No such authority is given under the act. The conduct of the games in 1929 was admittedly illegal. Their conduct in 1930 was just as much so. If exhibitions of this character are permitted, what is to prevent the fencing in of still larger areas, the hiring of more noted players and the building of more imposing grand stands? *Page 98 
The restrictive clause, as I have said, reads: "It is further understood and agreed that said conveyance shall be made upon condition and subject to the restriction that the premises above described shall be used solely as a public park or playground or for public park or public playground purposes."
I cannot presume that the complainant grantor intended to permit defendant grantee to commit the unlawful acts above described. The presumption, on the contrary, is that he meant that the land should be used only for lawful purposes. He has testified that he did not contemplate such acts and the restriction was to guard against them. He is corroborated by Mr. Miller who conducted the negotiations for the acquirement of the land on the part of the grantee, the village of South Orange.
I conclude that the playing of games on this property on Sunday is unlawful and a violation of the covenant in the deed of conveyance, and should be permanently enjoined.
The next question to be considered is whether the restriction I have quoted from the deed of conveyance permits the playing of games to which admission is charged on any day or any part of the land conveyed, which is fenced off from public view and to which the public may not have free access without payment of a fee.
In the case of Price v. Inhabitants of Plainfield,40 N.J. Law 608, the court of errors and appeals construed the meaning of the word "park" written on a filed map. It was contended that the word dedicated it to the public. The court said, third paragraph of syllabus: "The word `park' written upon a block on a map of city property indicates a public use." At page 613 Mr. Justice Reed said: "If the words `public park' had been upon it, no question would have arisen." The words "public park" appear in the restriction under discussion. The learned justice then proceeds to discuss the meaning of "park" — without the word "public" — as follows:
"But a park in a city means to the sense of every person a place open to everyone. It carries no idea of restriction to any part of the public or to any specific number of persons. *Page 99 
Restrictions as to time of entrance or behavior of those entering are conceivable, but the idea that any class of the community is to be excluded, would not be entertained primarily by any person in connection with the idea of a park within the limits of a city. That it was to be a place of public resort, would be the impression which any person would receive, by looking at the map in this case, delineating a tract of sixty acres, with streets, and a square or block, upon which is marked `Park.'"
It will therefore be apparent that our highest court has defined for us the words used in the restrictive covenant in this case and has held that it carries no idea of restriction to any part of the public or to any specific number of persons. In the case of Strock v. East Orange, 80 N.J. Law 619, cited by both counsel for complainant and counsel for defendants, Mr. Justice Parker, speaking for the supreme court, adopts the same general definition. He says, at page 622: "The playground, after all, is nothing but a modified park, a place for public resort and recreation. * * *" He further says, in effect, that when the land is acquired in fee by a municipality and fully paid for, there may be by legislative act considerable latitude exercised by the authorities in furnishing or arranging for special facilities to certain portions of the public. He, however, points out, on page 623, that the question of dedication does not arise in the case he is considering. The decision, therefore, is germane to the case before me only as it reiterates the definition given inPrice v. Inhabitants of Plainfield, supra, by the court of errors and appeals, that a playground is a modified park, and therefore is, like a park, a place for public resort and recreation.
In 46 Corp. Jur. 1373 the word "park" is defined as "an extensive area of land devoted exclusively to the use of the public and to be ornamented and embellished." Citing Buffalo,c., Railway Co. v. Hoyer, 147 App. Div. 205;132 N.Y. Supp. 31, 34: "An open or enclosed tract of land for the comfort and enjoyment of the inhabitants of the city or town in which it is located." Citing Archer v. Salinas City, 93 Cal. 43, 50;28 P. 839; 16 L.R.A. 145 (quot Ramstad *Page 100 
v. Carr, 31 N.D. 504; 154 N.W. Rep. 200): "An open space intended for the recreation and enjoyment of the public." CitingArcher v. Salinas City, 93 Cal. 43, 50; 28 P. 839;16 L.R.A. 145 (quot Frauenthal v. Slaten, 91 Ark. 350, 357).
3 Bouv. Dict. 2455, defines a public park or playground as follows:
"A pleasure ground in or near a city, set apart for the recreation of the public. * * * A place for the resort of the public for recreation, air and light; a place open for everyone.Price v. Plainfield, 40 N.J. Law 613. See Archer v.Salinas City, 93 Cal. 43; 28 Pac. Rep. 839; 16 L.R.A. 145."
In Riverside v. MacLain, 210 Ill. 308; 66 L.R.A. 288;102 Am. St. Rep. 164; 71 N.E. Rep. 408, the court said:
"A park is a `place for the resort of the public for recreation, air and light.' Price v. Plainfield, supra. `A park is a piece of ground in a city or village set apart for ornament, or to afford the benefit of air, exercise or amusement.' 17 Am. Eng. Encycl. L. 407. The title to these premises is vested in the village of Riverside, as trustee for the public, and the uses to which the premises may be devoted are limited to uses as a park or common."
It is clear, therefore, from the decisions I have cited in our own courts and from cases in sister states, that the restriction contained in the deed of conveyance, according to the legal interpretation generally put upon the words contained in it, limits the use of the lands conveyed to the enjoyment of the public at large and does not contemplate or permit the segregation of any part of it for games at which portions of the public are admitted on payment of admission fees.
Such being the meaning of the restrictive words, it follows that the village can use the land conveyed only as provided in the deed of dedication.
"If a dedication is made for a specific or a defined purpose, neither the legislature, a municipality, or its successor, nor the general public has any power to use the property for *Page 101 
any other purpose than the one designated, whether such use be public or private, and whether the dedication is a common law or a statutory dedication, and this rule is not affected by the fact that the changed use may be advantageous to the public." 18Corp. Jur. 127.
"They cannot sell the lands so dedicated, nor release or extinguish the uses for which they were dedicated, nor employ them in any way variant from the purposes for which they were designed." Fessler v. Town of Union, 67 N.J. Eq. 14 (at p.23), citing Trustees of the M.E. Church of Hoboken v. Mayor,c., of Hoboken, 33 N.J. Law 13 (at p. 19).
"The owner may in the act of dedication declare the specific public use to which he intended the donation, and it will remain subject to such specific use; but when the dedication is completed, the owner cannot thereafter revoke it or restrict or change the uses to which it was made." Trustees of the MethodistChurch v. Hoboken, supra.
"An owner making a dedication of land to the public has the right to specify the particular use to which the land is to be devoted, to impose such restrictions as he sees fit on such use, and the land cannot be applied to any other use, nor can the restrictions be destroyed." Streuber v. City of Alton,319 Ill. 43; 149 N.E. Rep. 577.
The contention of the defendants that the legislature by the act of 1911, supra, could and did authorize the village to change the use for which this land was by deed dedicated, is not sound. It confuses the rights which arise where an absolute fee is taken with those which exist when the property is dedicated to public uses. I express no opinion as to whether the legislature may change the use of land taken in fee or condemnation. It cannot, however, change the use to which land is restricted in a deed of conveyance to a municipality. Nor can the municipality do so.
"Where the absolute fee in lands is acquired by a municipal corporation, although with an expressed intention of using it for a special purpose, the property acquired may be applied by legislative authority to a wholly different public object, but where the grant to the corporation is only for a *Page 102 
specified use, the grantor retains the reversionary estate."Newark v. Watson, 56 N.J. Law 667 (at p. 674).
"The general principle of law on the subject is that municipal property is subject to legislative authority. When property is put in trust in the hands of such a corporation the effect is to prevent the corporation from perverting, at its own will, such property to other uses; but when the uses are public, and not derived from private grant, they are liable to be modified or changed, with the concurrence of the law-making power." Newark
v. Stockton, 44 N.J. Eq. 179 (at p. 186).
"The general rule undoubtedly is that the legislature itself does not possess the power to authorize the property dedicated for a particular purpose to be used for a purpose inconsistent with the purpose for which it was dedicated, unless in the exercise of the power of eminent domain, and that it has no authority, in such a case, to authorize a sale of the property. And statutes authorizing a sale by a municipality of land held for public use, when not needed for such use, have been held not to apply to property dedicated by the owner to the public." 4McQuillin Mun. Corp. (2d ed.) 611 § 1733,
3 Dill. Mun. Corp. (5th ed.) 1759 (from § 1103):
"If the municipal corporation holds the full title to the ground for public uses, without restriction, the legislature may doubtless direct and regulate the purposes for which the public may use it."
Page 1761 (from § 1104):
"It is therefore not possible to do more than to affirm that while the general rule is that the legislative dominion over the uses of public property is plenary, it is also true, as is more fully shown elsewhere, that there may be rights in the dedicator or in the abutting owner of such a nature — that is, property rights and rights resting upon contract — that they cannot be destroyed, and of which he can only be deprived by the exercise of the right of eminent domain — that is to say, on being justly compensated therefor."
In Jacksonville v. Jacksonville Railroad Co., 67 Ill. 540,
the court said: *Page 103 
"It would scarcely be contended that the city, holding the property merely as trustee, could divert the trust, divide the square into lots, and sell and convey them to private individuals, to be appropriated to such purposes as they might desire. The conveyance would be an absolute nullity, and the act would be abhorrent to every principle of right. It would be a gross perversion of a trust, which should be prevented by the interposition of a court of equity. If the municipality could not divert the property, neither could the legislature. The power of the latter is not unlimited, and cannot be exercised to interfere with trust estates and vested rights."
In the case of Portland and West Virginia Railroad Co. v.Portland, 12 P. 265, it was held:
"To this property thus dedicated to the public use the dominion of the legislature is attached but its power over it is not supreme. It might regulate its use or promote its improvement, but it could not divert or subject it to any use clearly inconsistent with the purposes of its dedication. To do that would violate the contract of dedication and any person interested would be authorized to institute proper proceedings to enjoin it."
In Riverside v. MacLain, supra, it was held:
"Statutory authority given a municipality to put driveways through parks relates only to parks created by a municipality or park commissioners and not to parks dedicated at common law."
In Warren v. Lyons City, 22 Iowa 351, the court said:
"Why may I not affix the terms, designate the uses and purposes, upon and for which I give to the public my farm or my lots? And upon what principle of law or morals is it that the legislature can say that this property may, at the option of the trustee, be used for another and different purpose?"
In Cummings v. St. Louis 90 Mo. 259; 2 S.W. Rep. 130; the opinion of the court was that the legislature had no right to extend or enlarge the use of property dedicated by proprietors of land for public use as a common, and it could *Page 104 
not, as against the proprietors or those owning property nearby, authorize a sale of such property.
LeClercq v. Gallipolis, 7 O., Part I, 217; 28 Am. Dec. 641, holds that where land is dedicated by a proprietor for a public square, and held in trust for such purpose, the legislature has no power, as against the inhabitants of the town where the land is situated, to authorize a lease of the property for other purposes.
Hill v. Borough of Belmar, 3 N.J. Mis. R. 254 (at p.256):
"The result of these suits and the testimony before us show conclusively that there was a dedication of the tract in question as and for a public park, and that the purchaser of lots purchased upon such representation, and that the plot would be kept open, insuring an unobstructed view of the ocean.
"Under such circumstances, the right of possession vests in the municipality, which holds a sort of secondary title in trust for the purposes of the dedication, while the bare legal title remains in the dedicator in trust for the use expressly or impliedly declared in the dedication. Fessler v. Town ofUnion, 67 N.J. Eq. 14; 56 Atl. Rep. 272; Jersey City v. MorrisCanal, 12 N.J. Eq. 547; Bayonne v. Ford, 43 N.J. Law 292;Methodist Church v. Hoboken, 19 N.J. Eq. 355; Price v.Plainfield, 40 N.J. Law 608.
"We are of the opinion that the use to which it is proposed to put this land is a use other and adverse to the purposes of the dedication. A park or public square cannot be said to be the same as a public swimming pool. Much testimony was devoted by respondent in the attempt to show that the construction of the proposed pool and its appurtenances would not materially obstruct a view of the ocean, nor exclude the public, but the fact remains that such use is not reconcilable with the use of a park or public square.
"We conclude, therefore, that such proposed use is unauthorized and ultra vires, and for that reason the ordinance must be set aside. * * *"
It should be observed that in this case, as in the one before me now, an attempt was made to exclude at least a portion of the public from a public park. *Page 105 
In the case of United States v. Illinois Central RailroadCo., 26 Fed. Cas. 461, the court said (at p. 463):
"There may be, perhaps, some force in the argument which declares that when property is dedicated generally to the public, without specifying the particular purpose, the public may use it for one purpose at one time and for another at a different time, but where the owner of property dedicates it to a particular public purpose, being not inconsistent with the law or public policy, I deny the right of the state or of the municipality to divert it from that purpose, except under the general authority which the public has to take property for public uses, which is sometimes termed the right of eminent domain. If an individual shall grant a lot of land or square in a city, for the purpose of constructing a school house upon it, or a church, or an institution of science, or for any useful public purpose, that property cannot be taken, as I apprehend, by the public except in the same way that any property can be taken."
Methodist Episcopal Church of Camden v. PennsylvaniaRailroad Co., 48 N.J. Eq. 452: In this case the court of chancery (Pitney, V.C.) enjoined the defendant from interfering with the rights of the complainant in a certain street which had been dedicated to be kept open for the use of complainant and others. The court says, at pages 454, 455:
"This right cannot be either destroyed or substantially impaired by legislative action, except upon the constitutional condition of making compensation."
In the case of Codman v. Crocker, 203 Mass. 146;89 N.E. Rep. 177; 25 L.R.A. (New Series) 980 (at p. 989), the court stated:
"This was virtually a decision that such a use was not a violation of the quasi trust under which the legal title is held. It does not disregard the doctrine relied on by the plaintiffs, that, where property is dedicated by donors to be public use for a particular purpose, it cannot, at least without the exercise of the paramount right of eminent domain, be appropriated to a use of a different character, in disregard of the trust under which it is held, and in violation of the *Page 106 
rights of the donors and their legal representatives. CaryLibrary v. Bliss, 151 Mass. 364, 375, 376; 7 L.R.A. 765;25 N.E. Rep. 92; Howe v. Lowell, 171 Mass. 575; 51 N.E. Rep. 536;Louisville and Nashville Railroad Co. v. Cincinnati, 76 Ohio St. 481,504, 506; 81 N.E. Rep. 983; St. Paul v. Chicago,Milwaukee and St. Paul Railroad Co., 63 Minn. 330, 352;34 L.R.A. 184; 63 N.W. Rep. 267; 65 N.W. Rep. 649; 68 N W. Rep. 458;Jacksonville v. Jacksonville Railroad Co., 67 Ill. 540, 543,544; Riverside v. MacLain, 210 Ill. 308; 66 L.R.A. 288;102 Am. St. Rep. 174; 71 N.E. Rep. 408."
The right of the complainant to proceed in this court to enforce the terms of the dedication and to prevent the use of the property for any other purposes is clear.
18 Corp. Jur. 130 says:
"Dedicator and His Representatives. The dedicator has such an interest in the property dedicated as entitles him to enforce the uses for which the dedication was made and to prevent a diversion therefrom, whether against the dedicatee or some third person who is interfering with the use of the property for the purposes for which it was dedicated, or against both acting in conjunction, and in case of the death of the dedicator, his representatives or his grantees, expressly or by implication as abutting owners, succeed to his rights."
Riverside v. MacLain, 210 Ill. 308; 66 L.R.A. 288;102 Am. St. Rep. 164; 71 N.E. Rep. 408, holds:
"A deviation from such use by the village is a violation of its duties as trustee for the public, and will result in damage to the property of appellees, and destroy their easement in the park. Where a park is thus cut up by the extension of a street through its middle, its use for purposes of pleasure, recreation and amusement will be destroyed. Where such a tract has been dedicated and accepted as a public park, and adjudicated to be such, the municipality has no power to convert any portion of it into a public highway, because such use is inconsistent with and destructive of its use as a park. * * * A distinction is to be made between *Page 107 
cases where a public square is dedicated without restriction and cases where the dedication is restricted to a particular purpose. In the former case, any reasonable public use may be made of the square, but in the latter, it must be devoted to the particular purpose indicated by the dedicator. Where land is dedicated for a public park and common, it cannot be said that the construction of an elevated driveway amounting in fact to nothing more than an approach to a railroad track, and only a little over one hundred feet long, is an act which amounts to keeping the park open for purposes of recreation and amusement. A distinction is also to be observed between cases where the facts show that a public park has been created and established by a municipality, under statutory provisions, and cases where the land has been dedicated for the purposes of the park by the original owner thereof. A pleasure driveway may be a legitimate feature of a public park created and established by a municipality, but in a dedicated park it is always a question of the intention of the donor."
Rowzee v. Pierce, 75 Miss. 846; 40 L.R.A. 402;65 Am. St. Rep. 625; 23 So. 307:
"So, land dedicated for public use as an ornamental park exclusively cannot be used as a site for a school house."
Board of Education v. Kansas City, 62 Kan. 374;63 Pac. Rep. 600:
"And land dedicated for other public purposes, evidently a public park, cannot be appropriated by the city council for school purposes."
It was held in McCullough v. Board of Education, 51 Cal. 418,
that the purposes for which public squares may be used are those defined by positive law, and that the erection of school houses thereon was not one of the purposes provided for.
25 L.R.A. (New Series) 980 (note):
"Whether or not a particular use of land dedicated for squares, parks and commons amounts to a diversion from the use for which it was dedicated, depends upon the circumstances *Page 108 
of the dedication, and the intention of the parties making it, and is, therefore, largely a question of fact.
"A different construction is placed upon dedication made by individuals from those made by the public. The former are construed strictly according to the terms of the grant, while in the latter cases a less strict construction is adopted. Spires
v. Los Angeles, 150 Cal. 64; 87 Pac. Rep. 1026; 11 A. E. Ann.Cas. 465; Riverside v. MacLain, 210 Ill. 308; 66 L.R.A. 288;102 Am. St. Rep. 164; 71 N.E. Rep. 408."
Howe v. Lowell, 171 Mass. 575; 51 N.E. Rep. 536:
"And the maintenance of a pumping station upon land constitutes a breach of a condition in a deed thereof to the city that `it shall be improved, dedicated and forever used by the grantee as and for a common park, or boulevard, and for no other purpose.'"
Flaten v. Moorhead, 51 Minn. 518; 19 L.R.A. 195;53 N.W. Rep. 807, where the clause "said tract of land hereby conveyed to be forever held and used as a public park," followed the description in a deed to a municipality, the municipality did not acquire an absolute title in fee, and an order refusing an injunction to restrain the erection of a jail on the land was reversed.
In Church v. Portland, 18 Oreg. 73; 6 L.R.A. 259;22 Pac. Rep. 528, the court said:
"The blocks were indicated on the map as public squares, which implied, of course, that they were to be enjoyed as such by the public at large, and not be appropriated and used by the city in the management and conduct of its affairs. The use of them in the way proposed would necessarily exclude the public from the use of them except for the transaction of city business; but that privilege can be enjoyed wherever the buildings may be located. The act of building the city hall in question would virtually be a purpresture. The city would be making that several to itself which ought to be common to many."
In Princeville v. Auten, 77 Ill. 325, the finding was that the mere fact that a block of ground was dedicated by the *Page 109 
original proprietors of a town for a "public square" does not confer upon the village trustees authority to appropriate it, in whole or in part, as a site for a town hall, against the wishes of any citizen interested.
4 McQuillin Mun. Corp. (2d ed.) 602 § 1738:
"One who has dedicated property to public use, whether by a statutory or common law dedication, has nevertheless such an interest as entitles him to sue to restrain the municipality from diverting it to any other use not consistent with the use for which dedicated, and he may bring a like suit against a third person who is so using it."
The village accepted the deed from the grantor, and entered into possession and control. It, therefore, accepted the restriction contained in the deed.
Dodge Bliss Co. v. The Mayor, c., of Jersey City,105 N.J. Eq. 545:
"The acceptance of deeds which pass land subject to a public use constitutes an assent by the grantee to the devotion of the land thereto."
At page 554 the court, referring to the deed taken by complainant, says:
"And that acceptance operated as an assent by the grantee to the devotion of the land to any public uses defined in or arising from the language of the deed," citing Camden v. McAndrews Forbes Co., 85 N.J. Law 260; 78 N.J. Eq. 244; and Earle v.Mayor, c., of New Brunswick, 38 N.J. Law 47.
In the Camden v. McAndrews Case, supra, Mr. Justice Parker, speaking for the court of errors and appeals, says, at page 266:
"True, the deed was not made by the land company as grantor, but it was accepted by it as grantee, and that acceptance operated as an assent by the grantee to the devotion of the land to any public uses defined in or arising from the language of the deed. Mayor, c., of Jersey City v. Morris Canal Co., 1 Beas.547; New York, c., Railroad Co. v. Drummond, 16 Vr. 511;affirmed, 17 Vr. 644; Central Railroad Co. v. Elizabeth, 8 Vr.432." *Page 110 
 Earle v. Mayor, c., of New Brunswick, supra (at p. 51):
"The grantee of a deed inter partes whereby an estate is conveyed, is bound by the conditions, covenants and stipulations therein, on his part, although it is only signed by the grantor. His acceptance of the deed is such assent to its terms as will render it binding on him."
In Borough of Spring Lake v. Polak, 76 N.J. Eq. 212, the court held:
"But little affirmative action is required to indicate an intention to accept a dedication of property to public use." Citing many New Jersey cases.
The complainant having, as I have said, the right to proceed in this court, it follows as a matter of course that this court has jurisdiction to enjoin the violation of the restriction.
3 Dill. Mun. Corp. (5th ed.) § 1106:
"Property unconditionally dedicated to public use, or to a particular use, does not revert to the original owner except where the execution of the use becomes impossible. If the dedicated property be appropriated to an unauthorized use, equity will cause the trust to be observed or the obstructions removed. But if the property is no longer devoted to the public uses to which it has been dedicated, and such public uses are no longer possible of execution, the fee will revert to the dedicator released from the easement of the public."
4 McQuillin Mun. Corp. (2d ed.) 609 § 1731:
"Diverting of property to another and inconsistent use is a misuser, and may be enjoined."
And section 1737, at page 619:
"And the only remedy for misuser, it seems, is by seeking equitable relief to compel a specific execution of the trust by restraining the municipality, or by causing the removal of the obstruction."
The nuisance created by playing games on Sunday may be abated at the instance of any citizen living in the neighborhood if it appear that the noise and disorderly conduct amount to a nuisance in that neighborhood. *Page 111 
 Cronin v. Bloemecke, 58 N.J. Eq. 313:
"The mere fact that crowds of disorderly persons upon the highways, drawn there by entertainments given by a third person upon his own lands for pecuniary profit, are a public nuisance, does not deprive a private person of relief by injunction against a special nuisance to his dwelling house by reason of such disorderly crowds."
Gilbough v. West Side Amusement Co., 64 N.J. Eq. 27:
"The noise caused by the shouts, cheers and stamping of feet of spectators at Sunday ball games, even though constituting a public nuisance, which may be dealt with as such, will be enjoined at the suit of individuals living in the neighborhood; it being such as to appreciably disturb their rest and quiet."
McMillan v. Kuehnle, 76 N.J. Eq. 256:
"The playing of baseball on Sundays will be enjoined if it be made to appear that the noise and disorderly conduct attendant upon the games being held forth amounts to a nuisance in the neighborhood, whereby the peace and quiet of the Sabbath is disturbed and the rest which the complainants are entitled to enjoy on that day is appreciably affected; each case must stand or fall on the question of nuisance or no nuisance, as the court of chancery has no jurisdiction to enforce, by injunction, the Sunday laws, so called.
"Noises which are not nuisances on a weekday may be nuisances when made on a Sunday, if they have the effect of disturbing that quiet and rest which the citizen is entitled to have for his recuperation; and the fact that such noises are forbidden by the laws of the land [the Sunday laws] takes away any defense for the making of them on Sunday even though they be but slight."
The order in this case granting a preliminary injunction was reversed by the court of errors and appeals on the ground that "a preliminary injunction ought not to be ordered unless from the pressure of an urgent necessity, and unless the injury or damage to be prevented, during the pendency of the suit, is in an equitable point of view of a character to cause irreparable injury." It only dealt, however, *Page 112 
with a preliminary injunction and did not deny the general principle as stated in the court below that such a case was one for equitable relief upon final hearing.
The complainant, as a trustee of the Meadow Land Society, has a right to maintain this action.
In the case of Joachim v. Belfus, 107 N.J. Eq. 240 (at p.245), Vice-Chancellor Backes said:
"Upon the dissolution of the Weequahic Park Company the title to the easement remained in the company. Dissolution of the company did not work an abandonment of the easement. Upon dissolution of a corporation, its corporate existence continues for the winding up of its affairs and conveying its real estate. In activity a corporation is managed by a board of directors; in dissolution by a board of trustees — the former directors. The board of trustees winds up its affairs and conveys its real estate, the title to which remains in the corporation meanwhile.Corporation Act, Comp. Stat. p. 1634 §§ 52, 53, 54."
Furthermore, the contention that he has no such right cannot now be made. It came too late. The defendants filed their answer, making no objection to the pleadings or to the right of complainant to institute the suit. Nor was a motion made to dismiss the bill of complaint. Months elapsed before the case was reached on final hearing. Our Chancery act (P.L. 1915 p. 196 §59; Chancery Rule 75; Objections to Pleadings) provides: "All objections to pleadings must be made by motion. Five days' notice of such motion must be given within the time limited for filing an answering pleading, and the notice must state the particular grounds of objection." In the case of Tipton v. Randall,87 N.J. Eq. 387, Chancellor Walker held that a party will not be permitted to move to strike out after he has pleaded to the merits. I quote from the chancellor's opinion: "* * * it follows that the motion to dismiss the bill in this case, made after the time for answering had expired and when an answer already put in had been overruled, with permission only to file an amended answer, came too late, and the complainants had a right to disregard it * * *." *Page 113 
Cites English cases and 31 Cyc. 275, and Hand v. Hand,60 N.J. Eq. 518.
I said at the hearing, and I now reiterate, that the decision of this case, in my opinion, depends mainly, if not entirely, upon the interpretation of the restrictive clause in the deed of conveyance. However, I allowed the fullest latitude to counsel in order that they might present whatever evidence seemed to them germane, and I have endeavored to discuss and decide all the points raised in the briefs submitted.
My conclusion is that the deed from the Meadow Land Society to the village of South Orange restricts the use of the land to public park and public playground purposes; that the meaning of the restriction is that the land shall be used by the general public and that no part of it shall be segregated and used for games to which admission is charged on any day of the week. I will, therefore, advise a decree permanently enjoining the defendants according to the prayer of complainant's bill.